EX PARTE T. J. TOWLES ET AL.

1. CONTESTED ELECTION.—The rule upon which a contest should be determined before the court, as contemplated by the act of 1875, (2d Sess., 14th Leg., 89,) was, that it should ascertain the number of legal votes cast by those entitled to vote at the election, without reference to the mere irregularities of the returns of election, or other such matters.

2. MANDAMUS—COUNTY-SEAT.—It was uniformly held, before the passage of the act of 1875, relating to a change of county-seats, that the writ of mandamus would not be issued by the District Court to correct the illegal proceedings of the officers or tribunal to whom the Legislature had intrusted the power and duty of carrying into effect the law for the change of a county-seat.

3. CONSTRUCTION OF STATUTES.—If the purpose of the statute be to accomplish a single object only, and some of its provisions are void, the whole must fail, unless there be sufficient remaining to effect the object without the invalid portion.

4. JURISDICTION—CONSTITUTIONAL LAW.—The Constitution of 1876 does not confer on the District Courts the power to entertain appeals from any other court than the County Court in cases of administration and guardianship; (art. 5, sec. 8;) nor does the present Constitution, as did that of 1869, give to the District Court "a general superintendence and control over inferior tribunals," which might have been exercised, by legislative direction, by some writ issued from the District Court.

5. JURISDICTION—APPEAL.—It is not competent for the District Court, under its present organization, to entertain an appeal by force of, and in the manner prescribed by, the act of 1875, relating to the removal of county-seats.

6. COUNTY-SEATS.—The law governing elections for the removal of a county-seat, makes them depend on the votes of the legal voters of the county, and this without regard to the voter's property interests, or how they might be affected by a change of location. The statute recognizes no property interest of the citizen or voter in its locality.

7. JURISDICTION—DISTRICT COURT.—An *ex-parte* proceeding in the

District Court, by a voter who invokes its jurisdiction, to review the proceedings of the Commissioner's Court in passing upon a contested election for the location of the county-seat of his county, is wanting in all the attributes of a case or suit cognizable in the District Court. Such a proceeding has neither subject-matter nor parties conformable to its jurisdiction.

8. CASES DISTINGUISHED.—Bradley v. McCrabb, Dallam, 506; Banton v. Wilson, 4 Tex., 405; Lindsey v. Luckett, 20 Tex., 516; McKinney v. O'Conner, 26 Tex., 22; Wright v. Fawcett, 42 Tex., 203; Rogers v. Johns, 42 Tex., 339, distinguished from this case.

9. CONSTITUTIONAL LAW.—It was the object of the framers of the Constitution to mark out a complete judicial system, defining generally the province of each of the courts, by reference to the objects confided to the action of each, and the relation of each to the others. Such a system cannot be changed by action of the legislative department, except when the power to make the change is conferred by the Constitution itself.

10. JURISDICTION—REMOVAL OF COUNTY-SEATS.—Under the act of 1875, providing for elections to fix the locality of a county-seat, there was no legally-recognized means by which the county judge could ascertain whether a majority of the legal voters of the county had applied to him by petition to order an election to determine a county-seat. The ascertainment of that fact was a condition precedent on which the legality of the action of county judge in ordering an election must depend.

11. CONTESTED ELECTIONS—APPEAL.—That portion of the act of 1875 relating to a change of county-seats, which gives an appeal to the District Court, is clearly repugnant to the Constitution; and what remains of the act is incomplete, and not capable of being executed in accordance with the apparent legislative intention.

APPEAL from Van Zandt county. Tried below before the Hon. M. H. Bonner.

On the 16th of May, 1877, an election was held in Van Zandt county, by order of the county judge of that county, on the petition of a number of voters, to locate the county-seat. Canton, then the county-seat, and within five miles of the geographical center of the county, and Wills Point, a town in said county, more than five miles from the geographical center of the county, were voted for.

The county judge having refused to receive and estimate the vote of Canton and another precinct, and estimating the

whole vote cast at Wills Point and the other precincts, declared and certified that Wills Point had received 652 votes and Canton 310, and that Wills Point, having received two-thirds of the whole, was elected.

Within twenty days after said election, T. J. Towles and other voters of said county, acting under section 4 of act of 13th of March, 1875, attempted to contest said election, by filing their protest against the same with the clerk of the County Court.

This contest came on to be heard by the County Court on the 20th of June following, and was determined by the County Commissioner's Court adversely to said contestants. Whereupon one of the contestants, claiming to be a legal voter of said county, gave notice of appeal to the District Court of said county, and gave bond, which was approved June 20, 1877, by the county clerk of said county. A transcript of said appeal was filed in the District Court.

The preceding action was had in the County Commissioner's Court. No action was had in the County Court, and to meet that phase of the case, under section 4, page 89, of the above-recited act, the contestants, within five days after the expiration of thirty days given the County Court to try said protest, filed in the District Court a certified copy of said protest and original proceedings, invoking the original jurisdiction of said court. By the above-recited act, as will be seen, it is provided, that "until final adjudication of contest under this act, the county-seat shall remain at the place antecedently fixed by law."

The county officers, however, at once removed the county records and their offices to Wills Point, which place alone was afterwards recognized as the county-seat of said county.

Under this state of facts, T. J. Towles, and other voters of said county, applied to the Hon. M. H. Bonner, judge of the District Court of said county, in vacation, for a peremptory writ of mandamus, to compel the clerks of the District and County Courts of said county to return the records and

keep their offices at Canton during the pendency of said proceedings.

This application was refused by the district judge. At the time for holding the District Court of Van Zandt county, it was opened by the judge at Wills Point; an order was entered consolidating the three proceedings, and the consolidated case was dismissed by the court for the want of jurisdiction.

From this judgment of the court this appeal was taken.

On the 18th of January, 1874, the Legislature of Texas, by a joint resolution, ratified the following amendment to the Constitution, which had received a majority vote of the people, viz.: "Section 40. (art. 12.) The Legislature shall not pass local or special laws in any of the following enumerated cases, that is to say, for locating or changing county-seats; regulating county or town affairs; regulating the practice in courts of justice; regulating the duties and jurisdiction of justices of the peace and constables; providing for changes of venue in criminal and civil cases; incorporating cities or towns, or changing or amending the charter of any city or village; providing for the management of common schools; regulating the rate of interest of money; remitting fines, forfeitures, or penalties; changing the law of descent. In all other cases where a general law can be made applicable, no special law shall be enacted; or in any case where a general law can be made applicable, no special law shall be enacted. The Legislature shall pass general laws providing for the cases before enumerated in this section, and for all other cases which in its judgment may be provided for by general laws."

After and in pursuance of the foregoing amendment, the Legislature, on May 1, 1874, passed an act "providing for the removal of county-seats." The first section of that act is as follows, viz.: ·

"Section 1. When a majority of the registered voters of any county shall petition the presiding justice of said county

for the removal of the county-seat of said county, it shall be the duty of such presiding justice to order an election for that purpose, giving due notice thereof as in other elections, which election shall be held at the same places and in the same manner as other elections for State and county officers, and the result of said election shall fix and establish the county-seat of said county."

Section 3 of said act provides that the presiding justice of the county shall, on the tenth day after the time of holding such an election, open the returns of the vote and estimate the result, and shall make and issue his certificate, which shall state the aggregate number of votes polled for each place voted for, and what point or place, if any, received the number of votes required under the law to change the county-seat, which certificate shall be *prima-facie* evidence of the truth of the matters therein contained, and no other election shall be held for the period of five years, having for its object a change of the county-seat.

Section 4 of said act is as follows, viz.: "Any legal voter of the county may contest the result of said election, by filing, within twenty days after the result of said election for county-seat has been declared, his written protest against said result as declared, with the clerk of the County Court, which protest shall contain the grounds on which said voter intends to contest said election. After the filing of said written protest, the County Court of the county shall, within thirty days, proceed to try said contest, and shall determine the same upon the law and the facts; and for the purposes of said trial, the County Court shall have full authority and power to compel the attendance of witnesses, and the production of all papers and documents necessary for the proper determination of such contest according to the law and the facts. After the determination of said contest by said County Court, any legal voter of the county, who may feel himself aggrieved by the decision of said County Court, may appeal said matter to the District Court of the county, by filing a bond conditioned.

for the payment of all costs, which bond shall be payable to
the presiding justice of the county, which said bond shall be
approved by the county clerk; or if the County Court shall
fail or refuse, from any cause, within the thirty days aforesaid,
to try and decide said contest, the party filing said protest shall
have the right to be heard in the District Court of the county,
by filing in said court, within five days after the expiration
of the thirty days, a certified copy of his protest; and in such
case the District Court shall exercise original jurisdiction to
hear and determine said contest on the law and the facts.
In all cases of appeal to the District Court from the de-
cision of the County Court, or in case the District Court ob-
tains original jurisdiction under this act, such contest shall
have precedence on the docket," &c. "In case of appeal to
the District Court, the case shall be tried *de novo*. Appeal
from the decision or judgment of the District Court under
this act shall be to the Supreme Court, under the regulations
now required by law, so far as not inconsistent with this act;
and so soon as said appeal is perfected to the Supreme Court,
said court shall at once proceed to determine said appeal,"
&c.

Section 56 of article 3 of the Constitution of 1876 pro-
vides: "The Legislature shall not, except as otherwise pro-
vided in this Constitution, pass any local or special laws au-
thorizing,   *   *   *   locating, or changing county-seats."

Section 2 of article 9 of the Constitution of 1876 provides:
"The Legislature shall pass laws regulating the manner of
removing county-seats, but no county-seat situated within
five miles of the geographical center of the county shall be
removed, except by a vote of two-thirds of all the electors
voting on the subject. A majority of such electors, how-
ever, voting at such election, may remove a county-seat from
a point more than five miles from the geographical center
of the county, to a point within five miles of such center; in
either case, the center to be determined by a certificate from
the commissioner of the General Land Office."

*Jones & Henry,* for relators.

1. If the fourth section of the act of 13th of March, 1875, (Gen. Laws, 14th Leg., 87,) is in force, the District Court erred in dismissing this case for want of jurisdiction of the appeal, provided " County Court," in the act, can be read " County Commissioner's Court " under the Constitution.

2. If by " County Court" in said act is to be understood " County Court" as defined by section 15 of article 5 of the Constitution, then, no action having been taken in said court on the protest, the original jurisdiction of the District Court was invoked under the provisions of said fourth section of act of 13th of March, 1875, and section 8 of article 5 of the Constitution, by the filing of a certified copy of said protest in said court.

3. If the fourth section of the act of 13th of March, 1875, is unconstitutional, every provision of said act must be held unconstitutional. ( Cooley's Const. Lim., 176, 177, 178 ; Reed *v.* Omnibus Railroad Co., 33 Cal., 212 ; People *v.* Mahaney, 13 Mich., 481 ; Commonwealth *v.* Hitchings, 5 Gray, 482 ; Slauson *v.* City of Racine, 13 Wis., 398 ; Warren *v.* Mayor, &c., 2 Gray, (Mass.,) 84 ; Commonwealth *v.* Clapp, 5 Gray, 97 ; Commonwealth *v.* Pomeroy, 5 Gray, 486, note.)

If the act of March, 1875, is tested by the present Constitution,—that is, as it would be if passed since its adoption,— we believe every section would be found in conflict with it to such an extent as to make the act void.

If the act of 13th of March, 1875, is unconstitutional, it follows that there is no law in force which, on election, can be held to change a county-seat. The removal of the records from courts is without authority ; and a peremptory mandamus for their return should have been awarded by the judge of the District Court.

*J. J. Hill, contra.*—Counties and county-seats. ( 2 Kent's Comm., 275 ; Cooley's Const. Lim., 240 ; 1 Dillon on Mun. Corp., secs. 9, 10 ; Dartmouth College *v.* Woodward, 4 Wheat.,

681; The People *v.* Morris, 13 Wend., 325; Bass *v.* Fontleroy, 11 Tex., 702; Worsham *v.* Richards, 46 Tex., 445; Walker *v.* Tarrant County, 20 Tex., 16; Alley *v.* Denson, 8 Tex., 300.)

The statutes. (Paschal's Dig., 1067; Const. 1875, art. 3, sec. 56; Fowler *v.* Brown, 5 Tex., 407; Gen. Laws, 1873, p. 194; Gen. Laws, 1874, p. 234; Gen. Laws, 1875, p. 87; Const. 1869, Gen. Prov., sec. 17; Const. 1876, Gen. Prov., sec. 24; Cooley's Const. Lim., 141.)

Was there any law? (Const. 1875, art. 9, sec. 2; Bill of Rights, secs. 12, 23; art. 3, secs. 8, 45; art. 4, sec. 25; art. 10, sec. 2; Gen. Prov., art. 16, secs. 2, 13, 15, 37; Cooley's Const. Lim., 60; Const. 1876, Gen. Prov., sec. 48.)

County organization. (Cooley's Const. Lim., 189, and notes; Const. 1836, art. 4, sec. 10; Hart. Dig., sec. 248; Hart. Dig., sec. 230; Dangerfield *v.* Secretary of State, Dallam, 358; Hart. Dig., 280; Hart. Dig., 285; Paschal's Dig., 1225, 1237; Const. 1866, art. 4, sec. 17; Paschal's Dig., p. 937; Const. 1869, art. 4, sec. 20; Gen. Laws, 1866, pp. 20, 41, 66, 74, 92, 170, 195, 219; 2 Paschal's Dig., 6112; Const. 1875, art. 5, sec. 18; Gen. Laws, 1876, p. 51, sec. 4, clause 11; Gen. Laws, 1876, p. 51, sec. 15.)

Only part in force. (Cooley's Const. Lim., pp. 177, 178.)

The result. (Walker *v.* Tarrant County, 20 Tex., 16; Alley *v.* Denson, 8 Tex., 301; Arberry *v.* Beavers, 6 Tex., 457; Worsham *v.* Richards, 46 Tex., 445.)

The contest. (Const. 1875, art. 5, sec. 18; Gen. Laws, 1876, sec. 4, clause 11, sec. 15.)

Jurisdiction of District Court. (Const. 1876, art. 11, sec. 8; Baker *v.* Chisholm, 3 Tex., 157; Field *v.* Anderson, 1 Tex., 437; Titus *v.* Latimer, 5 Tex., 433; Horan *v.* Wahrenberger, 9 Tex., 313; Thomas *v.* The State, 9 Tex., 324; Tadlock *v.* Tex. M. Com., 21 Tex., 166; Cowen *v.* Nixon, 28 Tex., 230; Banton *v.* Wilson, 4 Tex., 405; Lindsey *v.* Luckett, 20 Tex., 516; Wright *v.* Fawcett, 42 Tex., 206; Rogers *v.* Johns, 42 Tex., 340; O'Docherty *v.* Archer, 9 Tex., 295.)

Mandamus.    (1 Cranch, 171; 5 Pet., 192; 12 Pet., 620; 3
Pet., 202; 7 Pet., 573; 14 Pet., 513, 621.)

The court *a quo*.    (Baker *v.* Chisholm, 3 Tex., 157; Aula-
nier *v.* The Governor, 1 Tex., 653.)

ROBERTS, CHIEF JUSTICE.—The attempt to give the District
Court original jurisdiction under the fourth section of the act
of 1875, relating to the removal of county-seats, (2d Sess.
14th Leg., 89,) on the ground that the County Court had not
acted upon the contest, is shown not to have been effective,
by the record brought into this court, exhibiting the proceed-
ings of a regular contest before the Commissioner's Court, and
their decision thereon.    We think the Commissioner's Court
is the court indicated in said act for the trial of the contest of
said election.    The County Court as now organized, with a
county judge for the trial of causes, was not in existence
when the said law was enacted; but a court similar in its or-
ganization and in its general powers to the present Commis-
sioner's Court was then in existence, that is referred to in
said act as "the County Court."

The rule upon which a contest of an election should be de-
termined before the court, as contemplated by said statute,
was that it should ascertain the number of legal votes cast
by those entitled to vote at said election, without reference
to the mere irregularities of the returns of election, or other
such matters.    (McKinney *v.* O'Conner, 26 Tex., 11; The
People *v.* Cook, 14 Barb., (N. Y.,) 259.)

Instead of following this rule, it is to be inferred, from the
record, that said court, in acting on the contest, adhered more
strictly to the formalities of holding the election, and threw
out more votes than did the county judge.    Still, the record
recites that they rendered their decision upon a consideration
of the law and facts of the case; and that, under the terms of
the statute, defeated the original jurisdiction of the District
Court.

The District Court did not err in dismissing the proceeding

by writ of mandamus, applied for at the instance of the contesting voters, unless it can be held that they were entitled to an appeal to the District Court, and had done everything necessary to secure it, and that such writ was necessary to enforce the jurisdiction of the District Court, that had attached by said appeal. (Const. 1876, art. 5, sec. 8.) The Constitution gives the District Court no general supervising control, by writ or otherwise, over the proceedings of the Commissioner's Court, or any other such courts or inferior tribunals. (Id.)

It had been often and uniformly held by the Supreme Court, before the passage of this law of 1875, relating to a change of county-seats, that the writ of mandamus would not be issued by the District Court to correct the illegal proceedings of the officer or tribunal to whom the Legislature had intrusted the power and duty of carrying into effect the law for the change of a county-seat. (Arberry v. Beavers, 6 Tex., 457; Walker v. Tarrant County, 20 Tex., 20; Alley v. Denson, 8 Tex., 297; Worsham v. Richards, 46 Tex., 441.)

These decisions proceed upon two grounds: First. That the authority conferred upon the officer or tribunal by the previous laws, passed for the change of a county-seat by an election, was in the nature of a political trust, a deputation of authority from the Legislature to ascertain the wishes of the qualified voters of the county, and thereby fix the locality of the county-seat, which the Legislature might itself have ✔ formerly done, by petition or otherwise, at discretion; and that the determination of such officers or tribunals upon the matters thus intrusted to them was not subject to revision and correction by the District Court. In the case of Worsham v. Richards, above cited, it was held, that the provision of the constitutional amendments of 1874 did not change the rule on this subject. (Arberry v. Beavers, 6 Tex., 469.) Second. That no citizen or voter in the county had any such legal right or interest in the location of the county-seat, recognized by law, as would entitle him to apply to the Dis-

trict Court for redress, by a suit, or by any writ or other process. (Walker v. Tarrant County, 20 Tex., 20.)

If, then, this law of 1875, (2d Sess. 14th Leg., 87,) by giving a right to a voter to contest the election before the County Court, and when dissatisfied with its decision to take an appeal to the District Court for a trial de novo therein, has not given authority for changing the previous decisions, then the judgment of the court below in this case must be affirmed. This law, although passed before the adoption of the present Constitution, is retained in full force by a special provision, unless it is found to be "repugnant" to the Constitution. (Const., art. 16, sec. 48.) The Constitution itself provides that " the Legislature shall pass laws regulating the manner of removing county-seats," and prohibits that from being done by a special law. (Const., art. 9, sec. 2; art. 3, sec. 56.)

If this law is in harmony with the provisions of the Constitution, and such a law as the Legislature might have passed after these provisions, it must be held to be in force, and the District Court should have entertained the appeal from the Commissioner's Court. All of the proceedings in this case have occurred since the adoption of the Constitution of 1876.

It was the obvious intention of the Legislature, in the passage of this law, to make the change of a county-seat to depend, at the instance of any voter of the county who might take the proper steps, upon the judicial determination of the District Court, by a trial of the matters involved in the election de novo, the same as though it had never been tried in any other tribunal, and also to give the right of appeal to said voter, if he failed, to the Supreme Court. It is provided, that " any legal voter of the county who may feel himself aggrieved by the decision of said County Court may appeal said matter to the District Court of the county, by filing a bond," &c. No mode is prescribed for removing it into the District Court. It is called an appeal, but it is not an appeal to have errors of law or fact corrected, like an

ordinary appeal from the District to the Supreme Court; but, in substance, it is the same as an original trial of the contest in another tribunal.

It is also provided, that if the Commissioner's Court fails to act for thirty days, the contest may be carried at once and directly into the District Court, by the voter filing therein "a certified copy of his protest; and in such case the District Court shall exercise original jurisdiction to hear and determine said contest on the law and the facts." It makes no provision for notice to any person, or to any officer or tribunal, to act as an opposing party to this contest. It requires the voter to pay the cost, and to give bond to the district clerk upon his taking an appeal to the Supreme Court, which he is authorized to do. An appeal is given to no other party. And it further provides, that "until final adjudication of contest under this act, the county-seat shall remain at the place antecedently fixed by law."

These provisions show that the certificate of the county judge upon counting the vote, and the determination of the Commissioner's Court upon the contest, were parts of the proceedings contemplated. Still, they were comparatively minor parts in determining the result of the vote, and that if any legal voter desired it, and gave the required bonds for cost, the matter should still not be settled, until the judgments of the District and Supreme Courts were taken upon it; and until such judgment was obtained, the county-seat should remain unchanged. Or, in other words, if any legal voter objected to the change, and took the proper steps to secure it, there must be judgments of these courts rendered before any legal change could take place.

This law, therefore, we conclude, must stand as an entirety in its principal and leading features, or fail to be the means of changing the county-seat at all. If any legal voter who may feel himself aggrieved by the result as determined by the county judge or by the Commissioner's Court, is prevented by the Constitution, as it now exists, from obtaining the judg-

ment of the District and Supreme Courts upon the contest
he has instituted, then the principal means evidently most
relied on by the Legislature to have this matter settled cor-
rectly have failed to be effective as evidently designed.
This will be made more obvious hereafter.

The laws previously passed, of which there had been sev-
eral, intrusted the determination of this matter to the county
judge, or chief justice, or to the County Court, composed of
the judge and commissioners. (Act of 1838, Paschal's Dig.,
art. 1067; act of 1873, 13th Leg., p. 194; act of 1st Sess. of
14th Leg., 187.)   From the first law, in 1838, up to the time
this law was passed, it had been executed in a manner to
produce dissatisfaction amongst the citizens where it was at-
tempted to be carried out. Although there was no law
passed, or decision of our courts, that recognized that a citi-
zen had any legal right or interest involved in the question
of the locality of the county-seat, in point of fact, citizens
who lived at the county-seat of a county, and who settled
there because it was a county-seat, and made valuable im-
provements, were largely interested, in money values, in the
locality of the county-seat. When the Legislature made a
change, by these laws, dependent upon a vote of the qualified
voters of the county, they became liable to lose most of the
value of their property thus improved, not by the will of the
people of the whole State, as formerly, by an act of the Leg-
islature, but by the votes of the legal voters of the county,
and, as they often complained, by the fraudulent conduct of
those who had been intrusted with taking the vote and de-
termining the result. This also facilitated and invited the
efforts of those who had property elsewhere to enhance the
value of it, by procuring the county-seat to be moved to or
near it.

Thus the laws designed to allow the people of a county to
consult their own convenience about the place of holding
courts became, as the wealth of the country increased, a
means of speculation and profit to some, and of loss to others,

and have often perhaps been used for that purpose rather than for the public convenience. It is natural enough that persons who had, by this means, sustained material pecuniary injury should be dissatisfied, even upon a fair election; but when there have been grounds for belief that it has been unfairly done by the instrumentality of the agents appointed by the government to carry out the law, the dissatisfaction has been much greater, sometimes threatening a serious civil dissension, by resort to arms. The numerous suits that have been brought from time to time, from an early period to the present time, in the endeavor to have the conduct of these agents reviewed by the courts, attest a great lack of confidence in their impartiality, or ability to properly and justly execute the powers and duties intrusted to them. There was no contest or appeal provided by any of those former laws, and the courts persistently declined to furnish any relief, for want of jurisdiction in such cases. All of these circumstances must have been known to the members of the Legislature when they passed this law in 1875; and by it they determined to give to the dissatisfied voter, to any one of them in the county, a different remedy, by which he should be entitled to have the judgments of the District and Supreme Courts upon the merits of the contest, before there should be any change of the county-seat. To cut the remedy in the middle, and strike off the judgments of the District and Supreme Courts, would be to leave the matter as it stood before, substantially, with all of its habitually-attendant and constantly-increasing evils not remedied, when a more efficient and satisfactory remedy was imperiously demanded.

The old law was twice amended within the last five years prior to the passage of this law, and it is not reasonable to presume that the Legislature would have enacted this law at all, but to make the change of a county-seat dependent upon the judgments of the District and Supreme Courts, if any voter desired it, and would take the proper steps to secure it, and to make its change legally await that determination.

Mr. Cooley, in his Constitutional Limitations, says, speaking of an act: "If its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the invalid portion." (Page 178.)

Here, the object is simply the removal of the county-seat by an election, legally ordered, held, and decided. The law provides for the determination of the result of the election, by different stages in the progress of its accomplishment, at each of which the result may be determined; by the action of the county judge in computing the votes; by the decision of the Commissioner's Court upon a contest; by the judgment of the District Court on appeal, and by the judgment of the Supreme Court on appeal. Yet the statute requires that a legal voter who is aggrieved may have all these determinations upon the result of the election, before the county-seat shall be changed. It may be said, that if the appeal to the District Court cannot be allowed for want of jurisdiction of that court to entertain it, this is merely a reënactment of the former law, without the additional remedy intended to be granted. This would assuredly be so, ordinarily, in giving parties remedies to redress injuries, and in conferring rights susceptible of a division. But this statute gives the different stages of a remedy, in arriving at a determination of the result of the election, which is to give effect to the votes cast, ending with the adjudication of the Supreme Court, and says that "until final adjudication of contest under this act, the county-seat shall remain in the place antecedently fixed by law."

It is not left to inference, by the additional remedy having been given; but here is an express legislative declaration, that until the judgment of the Supreme Court is taken upon the legality of the election, the county-seat shall not be moved, if a legal voter of the county is sufficiently dissatisfied to take the necessary appeals to obtain it.

This derives increased force, from the fact that it must have

been known that some one would be dissatisfied, on account of his consequent pecuniary loss by the removal of the county-seat, and that, as illustrated by experience, the former laws did not furnish him an adequate remedy against the illegal conduct of the officers, through whose action the removal should take place.

It is important, then, to consider whether or not the District Court had the power sought to be conferred by this law: to entertain jurisdiction of the appeal in this case from the Commissioner's Court. The Constitution does not confer upon the District Court the power to entertain appeals from any other court than the County Court, in cases of administration and guardianship. (Const. 1876, art. 5, sec. 8.) Nor does this Constitution, as did that of 1869, give to the District Court " a general superintendence and control over inferior tribunals," which might have been exercised, by legislative direction, through some writ issued from the District Court. (2 Paschal's Dig., p. 1115, art. 5, sec. 7.)

Keeping in view this general explanation of the subject, the question may now be presented,—Does this law of 1875, relating to the removal of county-seats, confer upon the District Court the power to entertain this appeal from the Commissioner's Court? Or, to present it perhaps more aptly, is it competent for the District Court, under its present organization, to entertain this appeal by force of, and in the manner prescribed by, this law for the removal of county-seats?

It is suggested, by counsel for appellant, that it was " intended that, as it is a maxim of our law that ' there is a remedy for every wrong,' authority to provide for this remedy would be found under the general authority of the District Court, in all cases where it was not delegated to some other court." Such general authority is certainly not expressly given by the Constitution, and the division and specification of the jurisdiction of the several courts is too well marked out to raise such an authority by mere implication. As to

the maxim quoted, ("there is a remedy for every wrong,") it presupposes a perfection in government that has not yet been reached. As the subject of the removal of a county-seat has often been considered by this court, under different laws and Constitutions, and has always been a subject of difficulty whenever presented for decision, it is deemed proper now to consider it directly in reference to the present Constitution, and to the law of 1875, under which this proceeding was instituted.

The Constitution provides, that "the Legislature shall pass laws regulating the manner of removing county-seats; but no county-seat, situated within five miles of the geographical center of the county, shall be removed, except by a vote of two-thirds of all of the electors voting on the subject," &c. (Const. 1876, art. 9, sec. 2.)

This shows that it was intended that the removal should be left to the votes of the electors voting in the county, and that laws should be passed prescribing the manner of ordering and holding the election, and of determining the result. The very fact that such a provision was inserted in the Constitution, shows a full appreciation of the former difficulties attending it, and the necessity of a sure and permanent remedy by legislation. It being a public matter pertaining peculiarly to the convenience of the people of the county, it was to be expected that such laws would, as the present law did, intrust to the county judge and to the Commissioner's Court the duty of executing the laws in relation to it, in the first instance at least. If this law is to be taken as a law to be enforced under that provision, it is important to consider what right, interest, or privilege is given by it to the citizens of the county in the locality of the county-seat.

The county-seat of a county, like the county itself, is a part of the political and civil divisions of the State. It is provided for, and its locality determined, for the public convenience of the citizens in the transaction of their public business, especially for the holding of the courts, and for

the location of the public offices in and for the county.
Hence, this law gives to the citizen, as a legal voter resid-
ing in the county, a voice in determining its locality, and a
right to take action, by virtue of his being a voter alone,
to secure a proper determination of an election held for that
purpose.   This right, thus conferred, has no reference to his
property or pecuniary interest that may be dependent upon
its locality.   The law says "any legal voter of the county
may contest the result of said election," &c.   It is immaterial
what his pecuniary interests are, or where they are situated,
or what they amount to.   He derives no fees, profits, or per-
quisites from it directly, wherever it may be located, any
more than from the locality of the boundaries of his county.
There does not as yet, under the law, attach to him, as a citi-
zen, any recognized legal interest in its locality.   His right
is the same, whether he votes in the election or not.   It is
simply a right or privilege to go to the polls, and to enter
the courts as a voter to participate in determining for the
government the locality of one of its civil and political di-
visions, the county-seat of his county.   This proposition does
not deny the power of the Legislature to confer upon the
citizen either a conditional or absolute property interest in
its locality, but only that it has not as yet done it.

Is this, then, such a right as the District Court can pass
judgment upon in the mode prescribed by this law?   In
considering this question, it is to be noted, that under this
law there is but one party to the proceeding, either in the
District or in the Supreme Court, and that is the legal
"voter."   He pays the cost of the proceeding.   He has no
person cited to oppose him, and there is no provision for any
one to intervene, or legally to make any opposition.   He
does not obtain any judgment for anything, or against any
person, officer, or tribunal.   He can, after the judgment is
pronounced as to the legality of the election, obtain no writ
of execution or writ of possession, for himself or any one else.
He has simply as a voter, at his own expense, participated in

having rendered a final judgment, a declaration of record in court as to the locality of the county-seat, to stand and be observed, just as if it were an act of the Legislature, when the Legislature fixed it by law, as it formerly did.

The Constitution provides, that "the judicial power of this State shall be vested in one Supreme Court, in a Court of Appeals, in District Courts, in County Courts, in Commissioner's Courts, in Courts of Justices of the Peace, and in such other court as may be established by law." (Const. 1876, art. 5, sec. 1.)

It defines the general limits of their respective jurisdictions, and, either expressly or from the terms used, indicates the subject-matter of their action, their relation and mode of proceeding in the exercise of their jurisdictions.

The Commissioner's Court is here made a part of the judiciary, with its organization provided for, and its jurisdiction, its subjects, and mode of action indicated, by declaring that it " shall exercise such powers and jurisdiction over all county business as is conferred by this Constitution and the laws of this State, or as may be hereafter prescribed." (Art. 5, sec. 18.)

We find, by the laws referred to, that this court has the power to levy taxes for the county, to lay out public roads and appoint overseers, to make provision for indigent persons, to try contested elections for county officers, and the like, in the mode of action as prescribed by law, which is not in the shape of suits by plaintiff and defendant, concluded by a judgment determining the rights of parties, as by a judgment of a court of record. It acts at the solicitation of one party, or without it upon its own motion, as the law may prescribe.

It, in its jurisdiction, powers, and mode of action, is adapted to the determination of this right or privilege of the voter who may seek to contest the election for county-seat. The conclusiveness of its determination, however, on this and other like matters, is dependent upon the act of the Legisla-

ture under which it may act, and not like a judgment of a court of record. Its proceedings are not judicial proceedings, in the ordinary sense of those terms, although it is a court, embraced within the judicial department of the government of the State.

The Constitution makes no connection between this court and any other court in reference to a control of, or appeal from, its determinations.

It has no more relation to the District Court than it has to the County Court, or to any other court of the State. Its functions are peculiar, as well as the objects on which they are exercised.

The Constitution provides, that "the District Court shall have original jurisdiction in criminal cases of the grade of felony; of all suits in behalf of the State to recover penalties, forfeitures, and escheats; of all cases of divorce; in cases of misdemeanors involving official misconduct; of all suits to recover damages for slander or defamation of character; of all suits for the trial of title to land, and for the enforcement of liens thereon; of all suits for the trial of the right to property levied on by virtue of any writ of execution, sequestration, or attachment, when the property shall be equal to, or exceed in value, five hundred dollars; and of all suits, complaints, or pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at, or amount to, five hundred dollars, exclusive of interest."

Here we find, running all through this grant of jurisdiction to the District Court, the subject-matter to be a recognized legal right, or legal injury of person or property. There is also a limitation to the jurisdiction, dependent upon the value of the matter in controversy, in cases generally where the subject-matter relates to personal property. Running all through it, also, we find words indicating the general nature of the mode of proceeding contemplated in the exercise of its jurisdiction upon such subject-matter,—as, "crim-

inal cases," "cases" of divorce and other civil actions, and "suits, complaints, or pleas," without regard to any distinction between law and equity.

The same thing is indicated by the writs which the District Court is authorized to issue,—as, *habeas corpus, mandamus,* injunction, and *certiorari.*

A case is defined to be a question contested before a court of justice; an action or suit in law or equity. (Martin *v.* Hunter's Lessee, 1 Wheat., 352; Osborn *v.* U. S. Bank, 9 Id., 819; 9 Pet., 224.)

A suit is defined to be the prosecution of some demand in a court of justice. (Cohens *v.* Virginia, 6 Wheat., 407; Wayman *v.* Southard, 10 Id., 30.)

The District Court is, therefore, a tribunal for the trial of cases or suits in which there are usually contesting parties; some valuable right recovered or adjudged; a judgment of record, and execution to enforce it. Such is the general character stamped upon it by the Constitution.

There are cases that may be brought in the District Court wanting in some of these elements of the jurisdiction. For instance, an escheat may be a suit by the State for property, without any opposing party. Proceedings *in rem* might also come within its jurisdiction under laws authorizing them, without any opposing party being cited, either property or a recognized legal status being the object of the suit. (1 Greenl., sec. 525.) *Habeas corpus* is an *ex-parte* proceeding, but is always founded on some deprivation of legal right.

In some of the grounds of jurisdiction, any particular amount in the value of the subject-matter is not required; as suits for the trial of the title to land. And there may be others not enumerated,—for instance, suits, or motions, or other proceedings in the nature of suits, growing out of, and incidental to, judgments already rendered in the District Court. It may also be a subject-matter of such a nature as that a suit can be entertained in the District Court, irrespective of the amount involved, as in case of divorce, to estab--

lish the legal status of the party; in which also there will be no need of an execution to enforce the judgment.

In this connection, also, the case of an appeal to the District Court from the County Court, from a judgment thereof dismissing an administrator from the administration of the estate.

The object of this discussion of the subjects of jurisdiction of the District Court, as expressed in the Constitution, is to deduce from them the general nature of the attributes of suits or cases that may be constitutionally made the subjects of its jurisdiction, by laws passed by the Legislature, without undertaking to lay down any rule, otherwise than as it may be applicable to the case now before us, which, as it is deemed, is wanting in each and all of the attributes of a case or suit cognizable in the District Court. It has been decided, as before shown, that a legal voter has no such legal right or interest in the locality of the county-seat, as recognized by law. There are no contesting parties, no legal status of a party to be determined, no judgment to be enforced by execution, and no values to be adjudged.

The proceedings in the County Court, relating to the estates of deceased persons, are not similar, in the modes of presentation, to those in the District Court; but laws have been passed to give them a shape sufficiently conformable thereto, when an appeal is taken to the District Court.

No such laws have been passed in relation to an appeal from the Commissioner's Court. It is not doubted that the Legislature may pass laws which will give it jurisdiction of this matter, and so embrace in it all of the attributes of a suit cognizable in the District Court, so fully as that there shall be no question about it.

Whenever, for instance, the Legislature may choose to make a law responsive to the present state of facts relating to the subject, recognizing in a citizen of a county a right of property, a loss or gain of pecuniary values, equal to $500, dependent upon the removal of the county-seat, and makes

its illegal removal a ground of action, or suit in some shape or other, against some person, or officer, or tribunal, in the District Court, then there will be a subject-matter and parties certainly conformable to its jurisdiction.

The means of its getting jurisdiction, and the mode of its exercise, may then be, largely at least, a legitimate subject of legislative regulation.

Thus, suits have been entertained by the District Court, in different shapes, for the trial of the right to offices.

In them there were contesting parties, and a subject-matter of value, as recognized by law. A lucrative office is valuable as property to a party entitled to it, and therefore, when it is illegally usurped or withheld, a suit, in some shape or other, can be sustained for it. In the case of Wammack v. Holloway, 2 Ala., 33, it is said: "An office is as much a species of property, as anything capable of being held or owned." To sustain this, reference is made to Bacon's Abridgment, wherein it is said: "An assize lies for an office in tail, or for life; but this is to be understood of an office of profit; for of an office of charge, and no profit, an assize does not lie." "In an assize for an office newly erected and constituted, the demandant in his plaint must show what fee or profit is granted for the exercise thereof; for this office cannot have a fee or profit appurtenant to it, as an ancient office may; and for an office without fee or profit, no assize lies." (5 Bacon Ab., Offices G, 198.)

In the case of McKinney v. O'Connor, 26 Tex., 22, which was the trial of a right to the office of district judge, it is said, on the subject of jurisdiction of the District Court, that "in addition to a right to be determined, there are parties, having an interest in the right, regularly brought into court to prosecute and defend." And again: "There was no question made below about the value of the subject-matter in controversy; and if it be necessary to give jurisdiction, it is known, as matter of law, that the office is lucrative to an extent sufficient to give the court jurisdiction." This refers

to the salary of the district judge, then defined by the Constitution. This might or might not be held as to the value of all offices that have no salaries attached to them. And now, as the District and County Courts are in the main invested with similar jurisdictions in civil cases, with that of each determinable by the value of the subject-matter of the suit, it may be important to allege a value to the office sued for appropriate to the jurisdiction of the court in which the suit is brought. (See section 16 of article 5 of the Constitution of 1876.) These suits for the trial of a right to offices have reached the District Court, or have been brought in it in different ways and in different modes of proceeding, which may be seen by reference to the cases in our reports, and different reasons may have been given for the power of the District Court to hear and determine them. It will be found, that however in form presented, they, when entertained, have had in substance some of the necessary elements of suits or cases adapted to the exercise of the powers of the District Court, according to its jurisdiction as defined by the Constitution. (Bradley v. McCrabb, Dallam, 506; Banton v. Wilson, 4 Tex., 405; Lindsey v. Luckett, 20 Tex., 516; McKinney v. O'Conner, 26 Tex., 22; Wright v. Fawcett, 42 Tex., 203; Rogers v. Johns, 42 Tex., 339.) Reference has been made to these cases, because it has been supposed that the analogy they bear to this case will furnish some authority in favor of the jurisdiction of the District Court to entertain it.

The difference is most obvious. If the District Court were to investigate this case and pronounce its judgment thereon, it would, in effect, be deciding a question, at the instance of a voter, relating to the public convenience of the citizens of the county, abstract in its nature, because not enforced by it, and when pronounced, to stand as an act of the Legislature formerly would, simply to be taken notice of and observed by all officers and citizens as indicating the locality of the seat of justice, and thereby fixing and pointing out a

portion of the civil and political divisions of the State in that portion of it. It would make the District Court act as a commission to try an extra-judicial question. Hence the question involved in its adjudication has sometimes been styled a political question, which, it must be admitted, conveys no very definite conception of it as a subject of legal adjudication.

Thus far, I have considered the want of capacity of the District Court to adjudicate the matter involved in this case at the instance of one party, a legal voter of the county. Attention will now be given to the right of appeal, as provided for in this statute, from the Commissioner's Court to the District Court.

The fourth section of the act, (2d Sess. 14th Leg., p. 89,) after providing that any legal voter may contest the result of the election, as declared by the presiding justice, before the County Court, proceeds further to enact, that " after the determination of said contest by said County Court, any legal voter of the county, who may feel himself aggrieved by the decision of said County Court, may appeal said matter to the District Court of the county, by filing a bond, conditioned for the payment of all costs, which bond shall be payable to the presiding justice of the county, which said bond shall be approved by the county clerk; or if the County Court shall fail or refuse, from any cause, within thirty days aforesaid, to try and decide said contest, the party filing said protest shall have the right to be heard in the District Court of the county, by filing in said court, within five days after the expiration of the thirty days, a certified copy of his protest, and in such case the District Court shall exercise original jurisdiction to hear and determine said contest on the law and the facts." " In case of appeal to the District Court, the case shall be tried *de novo.*" "Appeal from the decision or judgment of the District Court under this act shall be to the Supreme Court, under the regulations now required by law, so far as not inconsistent with this act." Bond for such appeal is required

to be made payable to the clerk of the District Court, for the payment of cost by the said voter, which he is required to pay at all events.

Now, what is the nature of the "appeal of said matter," as provided for in this statute? What more, it may be asked, would, under this law, be filed in the District Court, upon taking said appeal, than when, upon failure of the County Court to act, it is brought in the District Court as an original proceeding, by filing a certified copy of the protest? Certainly nothing more than a certified copy of the bond for cost and of the decision of the County Court. There would be no need of anything else, as the matter would be tried *de novo*. Whatever else may have occurred in the contest before the County Court, would not be pertinent to the trial in the District Court. In either case, the matters tried would be exactly the same. What is here called an appeal, is merely a transfer of the contest from one tribunal to another, for another trial, at the instance of any legal voter of the county. The word appeal may be used here without strict accuracy. It may, in legal effect, amount to no more than if the act had said, that if any legal voter should be dissatisfied with the decision of the County Court upon the contest made before it, he should have the right to contest the result of the election, without reference to that decision, before the District Court, by filing therein, within five days, certified copies of the protest, bond for cost, and determination of the County Court. Under that construction, the trial would proceed, in all respects, so far as related to the action of the District Court, the same as though no proceedings had been authorized to be had before the County Court; and if it were a case of which the District Court could take cognizance, it is not perceived why its being miscalled an appeal should defeat its jurisdiction. It would substantially be an original proceeding in the District Court, as much as that named in the act, when the County Court failed to act on the contest within the thirty days. There is nothing in the constitu-

tional jurisdiction of the County Court militating against this
conclusion; for being, as to this subject, entirely within the
control of the Legislature, its determination thereon can be
made final, conditional, or of no effect whatever, upon any
contingency that may be prescribed by law.   In that respect
it is different, as to the conclusiveness of its determinations
or judgments on such a matter, from those of the District or
Supreme Court, rendered in a case within their appropriate
jurisdictions.

If, however, the word appeal is intended to be here used
in its proper sense, a very different question is presented, in-
volving the relation between the Commissioner's Court and
the District Court, in the system of judiciary established by
the Constitution.

It was certainly the object of the framers of the Constitu-
tion to mark out a complete judicial system, by defining gen-
erally the province of each of the courts, by reference to the
objects confided to the action of each, and the relation of
each to the others.

To that extent it must be held to be permanent, and not
subject to change by the action of the Legislature, except
as a change may have been provided for.   This is plainly,
though incidentally, indicated by a special provision for a
change in the jurisdiction of the County Court.  (Const. 1876,
art. 5, sec. 22.)

The relation of original and appellate courts is well de-
fined in the system.   The Supreme Court is an appellate
court in reference to the District Court as a court of original
jurisdiction in civil cases.   (Const., art. 5, sec. 3.)   Its status
and relation in that respect cannot be altered by the Legisla-
ture.   Similar is the relation between the Court of Appeals
and the County Court in civil cases.   The former revises
the proceedings of the latter on appeal, and corrects the
errors committed therein in the trial of civil causes.   Both
have jurisdiction of the same subjects of litigation, but one
with original, and the other with appellate jurisdiction.   One

is the superior, and as to it the other is the inferior court. The superior revises and corrects, and sends back its corrected judgments to the inferior to be executed. The transmission of a case from such inferior to such superior court, in the mode prescribed by law for correction of errors therein, is properly an appeal. There is no such relation as this prescribed in the Constitution, nor, as it is believed, contemplated by it, between the Commissioner's Court and the District Court, or any other court. The objects of its action and mode of proceeding are more nearly legislative than judicial in their character, and have no similarity to suits in law or equity in courts of record. It is not made dependent in its action upon the revision or supervision of any other court. Should its action inflict a legal injury, by violating the laws under which it acts, there may be a remedy found in some of the other courts, but not in the way of altering, modifying, correcting, or setting aside its judgment or determination, which is peculiarly the province of an appeal. If the Legislature can make a law to so change the constitutional relation of the courts as to give an appeal in this case, why not also in the levy of county taxes, the laying off of roads, provisions for the indigent, and the like, and thereby transfer in effect the whole jurisdiction of the Commissioner's Court to the District Court of the county? Such a thing could hardly have been contemplated by the framers of the Constitution in the distribution of the judicial powers of the State.

In addition to these objections to this act, as furnishing a proper remedy for changing the county-seat of a county, there is still another. The act of 1838 provided, that the chief justice of the county should order an election, when, in his opinion, he was applied to for that purpose by the necessary number of inhabitants. (Paschal's Dig., art. 1068.)

This was a very important delegation of authority, personal in its character, as it was merely on his opinion, which could not well be controverted, that the initiatory step was to be taken for the removal of the county-seat. At a time when

the locality of the county-seat in a county was regarded only as a matter of public convenience, there was little danger of the abuse of this liberal discretion. Subsequent experience demonstrated, as it may be presumed, that it was important to limit this discretion, so as to make it, as nearly as practicable, a ministerial act on the part of the officer or tribunal that ordered such an election. This is manifested by the act of 1873, in which it is provided, that " when a majority of all of the registered voters shall petition the County Court for a removal of the seat of justice, it shall be the duty of the County Court to order an election," &c. (12th Leg., p. 194.) This provision, as to the majority of registered voters, was also in the act of 1875. (2d Sess. 14th Leg., 87.) At the times these laws were passed, it was required, by the Constitution and laws, that there should be a registration of the legal voters of the county, which was accessible to the officers whose duty it was to order the election, and by which they could certainly be informed when the proper number had petitioned that would justify them in commencing this proceeding.

By the present Constitution, that went into force on the 18th of April, 1876, before the proceedings in this case commenced, registration was abolished, and thereafter prohibited. When the county judge ordered the election, there were no registered voters known to the law who, as such, could petition him. As a mere designation of persons, the registered voters, as mentioned in the law, may be understood to be the legal voters of the county. That is not the point of difficulty. It is, that there being no registration list of voters to refer to, in order to ascertain whether or not a majority of the legal voters of the county had applied to him by petition, there was no legally-recognized means afforded him of arriving at the certainty of that fact required by law, before he had any right to order the election for the removal of the county-seat. It is that alone which gives him the right to order the election. It is a condition precedent, upon which the legality of his ac-

tion in ordering the election depends. It is not reasonable to suppose that the Legislature, in passing a law now, would make the ordering of the election depend upon a fact so difficult of ascertainment, if generally practicable at all with any definite certainty, and so easily misrepresented, when a fraudulent effort might be made to remove a county-seat for considerations of gain.

With the policy adopted of throwing a subject relating to the political or civil divisions of the State, that should be determined solely upon the public convenience, into the pool of wrangling self-interest, a prize of loss and gain pecuniarily dependent upon the will of the legal voters of a county, either fairly or unfairly ascertained, and not upon the will of the whole people of the State through its Legislature, this court has nothing to do, further than to give expression to the regret that the court, in the execution of it, has never been able to construe the statutes passed upon the subject in a way to prevent continually-recurring difficulties in the decision of the cases as they have come up into this court.

A knowledge of those difficulties may have induced the late Convention to expressly enjoin it upon the Legislature, peremptorily, to "pass laws regulating the manner of removing county-seats." (Const. 1876, art. 6, sec. 2.)

Mr. Cooley says, upon authority, in treating of statutes, that " if when the unconstitutional portion is stricken out that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which is rejected, it must be sustained." (Cooley's Const. Lim., 178.)

That part of this statute which gives an appeal to the District Court is believed to be clearly repugnant to the Constitution; and that which remains, to wit, the ordering, holding, and contesting the result of the election, is incomplete, and not capable of being executed in accordance with the apparent legislative intention.

Said act being, as we conclude, both inadequate to accom-

plish the object as intended by it, and repugnant to the present Constitution, is not such a law, either in whole or in part, as it was contemplated by the Constitution should be passed by the Legislature, "regulating the manner of removing county-seats."

The judgment of the District Court, dismissing the three cases consolidated, for want of jurisdiction, is affirmed.

Affirmed.

Separate Opinion of Associate Justice Gould.—I do not concur in so much of the opinion as holds that part of the statute giving to any legal voter of the county the right to contest the result of the election in the District Court to be unconstitutional. Whilst this difference of opinion would not, of itself, have led me to give it expression on the record, or in a dissenting opinion, I feel it to be a duty to do so in this case, because I regard the opinion of the court as substantially overruling former decisions on the subject of contested elections, and because the constitutional questions involved are of such importance as to justify the fullest examination.

In the opinion, the contest authorized by the statute is held to be wanting in all the essential elements of a case cognizable in the District Court, viz., contesting parties, a legal status of a party or other subject-matter to be adjudicated, a judgment not abstract, but enforcible by execution, and a pecuniary value of $500 or more involved. Passing, for the present, the first three of these essential elements of a suit, in which the contest is said to be deficient, with the remark that the defect is rather formal than real, I propose to consider the last, which seems to be most relied on. Assuming that the District Court must act in such cases by virtue of its constitutional jurisdiction, the opinion denies that a voter who has not at stake a pecuniary interest of $500 can bring the case into the District Court.

In the case of Rogers v. Johns, 42 Tex., 349, this court

said: "The determination of the result of an election is not a matter pertaining to the ordinary administration of the law in courts of justice, but is in its nature a political question, to be regulated under the Constitution by the political authority of the State. The Legislature has seen fit to constitute the District Court a special tribunal for the trial of certain cases of contested elections. In trying such cases, the District Courts act under authority conferred by the statute, and not by virtue of any jurisdiction conferred by the Constitution." The statute had not given a right of appeal from the District Court; and it was held, (following O'Docherty v. Archer, 9 Tex., 295,) that there was no such right, and that no constitutional provision was infringed by its denial. (See, also, Wright v. Fawcett, 42 Tex., 203.) I am unable to see, in so far as the question of jurisdiction is involved, that there is any substantial difference between contested elections for office and for the removal of a county-seat; and, therefore, I say, that in holding that the District Court, in cases of the latter class, can only act by virtue of its constitutional jurisdiction, the cases just cited are substantially overruled. I am yet to be convinced of the unsoundness of those decisions, or that the Constitution—though, in allotting to the different courts their jurisdiction, it uses such terms as "cases, suits, complaints, and pleas," which are certainly quite comprehensive—contemplated any species of contested election.

If such contests are cases or suits within the meaning of the Constitution, then, like ordinary suits, they must be instituted in the District, County, or Justice's Court, according to the amount in controversy; and it is equally beyond the power of the Legislature to refer such contests to any special tribunal, and to take away the right of appeal to this court or the Court of Appeals, as the case may be. But in fact, although the Constitution of 1845 secured the District Court in its jurisdiction " of all suits, complaints, and pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at or

amount to $100," the legislation under that Constitution, and subsequent thereto, down to and including the last session of the Legislature, which was under the present Constitution, has referred such contests to courts, without regard to the pecuniary value of the office, and has assumed to regulate both the tribunal and the mode of procedure, as if untrammelled by any constitutional provisions on the subject. The act of 1848 made all contests for county offices triable before the County Commissioner's Court, and gave no appeal. (Paschal's Dig., art. 3609.) The last Legislature, on the other hand, referred all contests for any district or county office to the District Court, with a clause, however, providing in certain cases for a trial in vacation, in chambers, by the district judge. (Gen. Laws, 15th Leg., 70.) These are but examples, serving to show what has been the uniform character of the legislation on the subject, and that practically, in the past history of the State, contested elections for office have not been treated as ordinary suits. Moreover, throughout the long period during which such laws have been enforced, we not only look in vain for any decision of this court denying their constitutionality, but, on the contrary, we find the decisions treating them as valid, and recognizing the legislative power to confer jurisdiction of such cases on the County Court, without any right of appeal.

O'Docherty *v.* Archer, 9 Tex., was a case in which the result of an election for chief justice of the county was contested under the statute in the County Court; and one of the parties sought to revise the action of that court by *certiorari* from the District Court, and upon the dismissal of the *certiorari* appealed to this court. Justice Wheeler, delivering the opinion of the court, says:

"The statute which confers upon the County Court jurisdiction to try contested elections for county offices gives no appeal from its decision. (Hart. Dig., art. 919.) In constituting the tribunal, it was optional with the Legislature to give an appeal or not, as might best comport with their

views of public policy. As no appeal was given, the inference must be that none was intended. The terms of office of these officers are of so short duration, that in many cases the term would expire before the right could be finally determined, if the parties were allowed to litigate their respective claims through successive appeals to the court of last resort. Not only public policy, but the real good of the parties themselves, who are immediately affected by the decision, demands that controversies of the character of the present should be determined with the least possible delay and expense. Such considerations, doubtless, induced the Legislature to confer the jurisdiction to decide in contested elections of county offices on the County Court, which, from its organization, can hear and determine the controversy at once, rather than upon the District Court, whose sessions are less frequent, and where the decision may be delayed, by continuances from term to term, for years. If it had been the intention that the District Court should take cognizance of the question, in any form or at any stage of the case, it probably would have been invested with the jurisdiction in the first instance, as in 'the case of contested elections for State officers.' The judgment dismissing the *certiorari* was affirmed." See, also, Fitzhugh *v.* Custer, 4 Tex., 391, and Lindsey *v.* Luckett, 20 Tex., 521, in each of which the jurisdiction of the County Court, as given by statute, is recognized.

Such having been the implied judicial construction of the Constitution of 1845, and such, at all events, the practical construction of the clause thereof regulating the jurisdiction of the District Court, is it not reasonable to conclude that the expression, "all suits, complaints, or pleas whatever, without regard to any distinction between law and equity," was repeated in the same connection in the present Constitution with the design that it should receive the same construction; and that if, on the other hand, it had been intended to effect so important a change in established laws, decisions, and

usages as to require contested elections to be placed on the same footing as ordinary suits, that intention would have been plainly expressed by the use of different terms ? The language of the Constitution is not necessarily to be taken in its most comprehensive meaning, so as to include "every question contested before a court of justice." The words "case" and "suit" may have been used without intending to embrace every possible judicial controversy, but in the more restricted sense of criminal prosecutions and suits between individuals in regard to some matter of private right, where the proceeding is according to the course of the common law. The Constitution of California gave to the District Court jurisdiction "in all cases of law and equity where the amount in controversy exceeds $200," and gave to the County Court jurisdiction of "all such special cases and proceedings as are not otherwise provided for."·

It was claimed that a contested election was not a "special case," but was only a form of trying title to an office, and that a statute giving to any elector of the proper county the right to contest the election in the County Court was unconstitutional, as infringing on the jurisdiction of the District Court. The court held, that by the common law, an election could not be contested by an elector; that the proceeding was not according to the course of the common law; and that though a value of over $200 might be indirectly affected, that it was one of the "special cases" contemplated by the Constitution. (Saunders v. Haynes, 13 Cal., 152.)

The Constitution of Texas, though silent as to special cases, cannot be construed as fixing the tribunal for the trial of all classes of cases or suits, without exception; for there are certainly some exceptions too well established to be denied.

The courts take jurisdiction of suits against the State, whether for money or for land certificates, only when the State has given its consent by statute, and then the jurisdiction is taken by such tribunals and under such regulations as the statute directs. (Hosner v. De Young, 1 Tex., 769;

Houston *v.* Robertson, 2 Tex., 20; Borden *v.* Houston, 2 Tex., 610; Bates *v.* Republic, 2 Tex., 618; Rose *v.* Governor, 24 Tex., 496; Treasurer *v.* Wygall, 46 Tex., 447; State *v.* Manchaca, 1 Tex., 587; State *v.* De Casinova's Adm., 1 Tex., 403; Trimble *v.* Smithers, 1 Tex., 802; Bell *v.* Payne, 2 Stewart, (Ala.,) 414; Murray's Lessee *v.* Hoboken Land and Improvement Co., 18 How., 283.)

The Legislature of this State has always assumed full power over such claims against the State, and have referred them to special tribunals, sometimes with the right of appeal to the District Court. (Paschal's Dig., arts. 4182, (1848,) 4245, (1852,) 4206, (1854,) 1151, 1158, (1860.)

So similar authority has been assumed over claims for damage where property is taken for public use, and, in part at least, has been recognized by the courts. (See Railroad Law and Road Laws, including that passed by the last Legislature; Acts 15th Leg., 64, arts. 10, 11, 12; Railroad Co. *v.* Ferris, 26 Tex., 598; Railroad Co. *v.* Milburn, 34 Tex., 224; Appeal of S. O. Houghton, 42 Cal., 62; Embury *v.* Conner, 3 Comst., 523; Striker *v.* Kelly, 7 Hill, 9; and 2 Denio, same parties, 323; Duer *v.* Police Court, 34 Tex., 283.)

Whilst these exceptions, including contested elections, are all cases in which the interest of the State or the public is primary and controlling, and in which perhaps the citizen has, under the Constitution and general law, no right to resort to the courts, save as it may be given him by statutes which at the same time regulate the remedy, it is not proposed to deduce from them any general rule. They are exceptions so well established that they cannot be ignored in construing the Constitution. " Constitutions," it is said, " were designed for the protection of the people in the enjoyment of their rights, and in the powers which they possessed before the Constitution was made; a constitution is the framework of the political government, and is necessarily based upon the preëxisting conditions of laws, rights, habits, and modes of thought." (Potter's Dwarris, p. 347.) " Constitutions, less than other instru-

ments," says the same author, quoting from Vattel, "depend in any great degree upon mere verbal criticism, or upon the import of single words." "We should never forget that it is an instrument of government we are to construe, and that must be the truest exposition which best harmonizes with its design, its objects, and its general structure." (Id., p. 678, citing Vattel, b. 2, ch. 17, secs. 285, 286.) One object in the allotment to the different courts of their jurisdiction, doubtless, was to fix the tribunal to which the citizen might resort, without power in the Legislature to prevent him, for the redress of those injuries to his person, property, or reputation which gave him, under the Constitution and law, a right to a trial in a court of justice. Certainly contested elections for county-seats were not such suits as were of right, save as made so by the statute; and it could scarcely have been the object of the Constitution to embrace such cases as contested elections for office in this allotment of jurisdiction, and thereby secure to parties the right to prolong such contests by appeal and writ of error, to the public detriment. The public interest requires such contests to be promptly settled. The interest of the State and the county, or the public, is controlling, and takes precedence of that of the citizen who seeks the office, or contests the result of an election for removal of the county-seat. In view of the public interests, and in regard to county-seats, under the power expressly conferred on them to "pass laws regulating the manner of removing county-seats," the Legislature might have provided a summary mode of determining all such contests. They have endeavored, however, to give to a dissatisfied voter the right to contest the result in the District and Supreme Courts, after first resorting to the County Commissicner's Court; and in doing so have not, in my opinion, violated the Constitution, although the voter may not have a property or pecuniary interest in the result. In several of the States, the right to contest the result of an election is given to a certain number of the electors, without regard to the participation or

wishes of the candidates; and the courts have entertained such cases. (Ferguson *v*. West, 16 Grat., 270; *Ex-parte* Ellyson, 20 Grat., 24; Saunders *v*. Haynes, 13 Cal., *supra*; Skerrett's Case, 2 Parsons, 509, as reported in Brightley's Election Cases, 321.)

The objection, that there are no contesting parties, is not more forcible than in a proceeding *in rem* in admiralty, or under the Stock law. Real contestants are only too abundant and eager in such cases; and whilst the statute might well have regulated the subject, the law is not, in my opinion, invalid because of the failure to designate the form of the contest.

The legal status of the county-seat is a sufficient subject-matter, and the judgment is as little open to the charge of being an obstruction as a judgment in a suit for divorce, and is not less enforcible by execution than a judgment against the State.

In the language of Justice Curtis, speaking, however, of a case of a different nature, "There are matters involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress (the Legislature) may or may not bring within the cognizance of the courts of the United States, as it may deem proper. Equitable claims to land by the inhabitants of ceded territories form a striking instance of such a class of cases; and as it depends upon the will of Congress (the Legislature) whether a remedy in the courts shall be allowed at all, in such cases they may regulate it, and prescribe such rules of determination as they may think just and needful." (Murray's Lessee *v*. Hoboken Land and Improvement Co., 18 How., 284.)

As the conclusion from what has been said, is that contested election cases are not by the Constitution allotted to the District Court, the question remains,—Can that court act as a special tribunal in such cases, under authority from the statute?

The opinion prevails with many that it is not competent for the Legislature to give to the courts jurisdiction over cases not comprehended in the allotment made by the Constitution to the different courts, but that cases of a character different from those thus allotted cannot be referred to the constitutional courts. In other words, that the jurisdiction of the District Court is so fixed by the Constitution that it can neither be added to nor taken from. It is to be remarked of the present Constitution, that whilst it contains no clause giving to the District or other court jurisdiction of all cases not otherwise provided for, and it might therefrom be inferred that it was assumed that all possible cases were foreseen and provided for in that instrument, yet section 1 of the article on the judicial department provides, in addition to the enumerated courts, for "such other courts as may be established by law." If every possible case susceptible of judicial determination is by the Constitution allotted to some designated court, and if being so allotted they must there remain, it is evident that none are left for other courts, and the constitutional provision for other courts is useless. But, in truth, we know that human foresight is limited and fallible; that there must, in the very nature of things, arise cases unforeseen, and therefore unprovided for by any specific designation; and as it is plain that, under the Constitution, such cases might be allotted to the "other courts" than those fixed by the Constitution, it would seem to be a reasonable conclusion, that the Legislature might, instead of establishing a new tribunal, make one of some of the already sufficiently numerous courts for the same purpose. If the Constitution fails to cover the whole ground of litigation, why may not the Legislature supply the gap in that way? That the jurisdiction of a constitutional court cannot be taken from it without violating the Constitution which prescribed that it should have such jurisdiction, is plain. It would follow, that the jurisdiction of a constitutional court cannot be added to at the expense of any other constitutional court, for that would violate

the rule just stated.   (See Harris *v.* Vanderveer, 21 N. J. Eq.,
(6 C. E. Green,) 434, where this is the rule laid down.)   But
whilst the proposition, that the jurisdiction of a constitutional
court cannot be added to, has sometimes been enunciated
from the bench, it has not, so far as I can discover, been
applied where there was not held to be something else in the
Constitution indicating an intention not to allow the increased
jurisdiction.   In Titus *v.* Latimer, 5 Tex., 436, Justice Lips-
comb said of the District and Supreme Courts, that they were
essentially the creatures of the Constitution, and that " on
these courts the Legislature can neither confer nor take away
jurisdiction."   But the decision denying the right of appeal
from the Justice's to the District Court, was placed on the
ground, that in providing for a general superintendence and
control over inferior jurisdictions by means of writs, it was
intended to withhold the right of appeal.   In the celebrated
case of Marbury *v.* Madison, 1 Cranch, 137, the Supreme
Court of the United States held, that Congress could not add
to the original jurisdiction given to that court by the Consti-
tution;. but that decision was based, not upon any general
reason forbidding the extension of the jurisdiction of a court
created by the Constitution, but upon the implied prohibi-
tion arising out of the clause following the designation of
the cases in which it shall take original jurisdiction, viz.:
" In all other cases the Supreme Court shall have appellate
jurisdiction."   It was held, that the plain import of the words
limited the original jurisdiction to the cases described in the
Constitution.   So far as I have been able to find, these cases
are, as much as any other, referred to and relied on as adju-
dications establishing that a constitutional court cannot act
otherwise than by virtue of its constitutional jurisdiction.

And why, I ask, may not suits against the State, without
reference to subject-matter or amount, or cases of contested
elections of whatever nature, or, indeed, any special cases or
proceedings not necessarily, under the Constitution, pertain-
ing to the courts; or yet, if there be any such, any ordinary

suits or cases not embraced in the allotment to the court spe-
cified in the Constitution,—why, I say, may not the Legisla-
ture distribute all of these to such of the constitutional courts
as are in their organization fitted for their adjudication ?    Is
the independence of the courts endangered by accepting from
the Legislature jurisdiction of cases against the State, or of
cases of contested elections for county-seats, or for office ?
The habits of our citizens lead them to look to the regular
courts of the country for an impartial and intelligent decision
of controversies, and the Constitution was scarcely designed
to prevent those courts from lending their aid to the decision
of such questions of public interest as are in their nature sus-
ceptible of judicial determination, and which may be by the
law-making power referred to them.    There is no analogy
between the exercise of such jurisdiction and a case in which
the court is sought to be charged with executive duties, or to
be used as a mere commission.    The Constitution secures the
independence of the constitutional courts; but surely that
independence may be left unimpaired, although they should
act as special tribunals in such cases as contested elections or
suits against the State—cases in their nature appropriate for
the action of the courts, but cases not assigned by the Consti-
tution to any court.

Reading the Constitution in the light of the judicial history
of the State, and construing it so as to leave unimpaired the
protection which it throws around the citizen in his life, lib-
erty, and property, but so as at the same time to facilitate
the settlement of questions affecting the public, in accord-
ance with established usages, my opinion is, that on these
principles, and under the authority over the entire subject of
the removal of county-seats, vested by the Constitution in the
Legislature, it was competent for them to allow the result of
an election for the removal of a county-seat to be contested
in the District Court by a voter, although he had no pecu-
niary interest in the matter; and, therefore, that in this case
the District Court should have proceeded to try the case and

adjudicate the same, ascertaining " the number of legal votes cast by those entitled to vote at said election, without reference to the mere irregularities of the returns of the election, or other such matters."

[This case was submitted at Tyler, but carried to Galveston, and there decided, February 7, 1878.]