Teresa D. AGUIRRE, Appellant,

v.

The STATE of Texas.

No. 0580–98.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 29, 1999.

As Modified on Denial of Rehearing
Dec. 8, 1999.

Enrique N. Medrano, El Paso, for appellant.

H. M. Fleming, City Atty., El Paso, Matthew Paul, State's Atty., Austin, for State.

WOMACK, J., delivered the opinion of the Court, in which McCORMICK, P.J., and KELLER, HOLLAND, and KEASLER, JJ., joined, and in Parts I and II of which PRICE, J., joined.

The issue in this case is whether a culpable mental state is required in an ordinance, which regulates adult businesses, and that is silent about whether a culpable mental state is required. We hold that it is.

## I.

A 1987 ordinance of the City of El Paso made it a misdemeanor offense to "own, operate or conduct any business in an adult bookstore, adult motion picture theater or nude live entertainment club" within one thousand feet of certain kinds of property.[1]

According to the stipulated evidence, two city inspectors entered Aldo's Lounge on August 25, 1988, and found that it was conducting business as a "nude live entertainment club that was located within one

1. "Adult Businesses

"A. No person shall own, operate or conduct any business in an adult bookstore, adult motion picture theater or nude live entertainment club within one thousand feet of the following:

"1. A church;

"2. A public or private elementary or secondary school;

"3. A nursery school, kindergarten, child care center, day nursery or day care center;

"4. A university, college, vocational or business school;

"5. A boundary of any residential district;

"6. A public park adjacent to a residential district;

"7. The property line of a lot devoted to any residential use;

"8. Another adult bookstore, adult motion picture theater or nude live entertainment club.

"B. For purposes of this section, the following definitions shall apply:

"1. Conduct Any Business.

"Any person who does any one or more of the following shall be deemed to be conducting business:

"a. Operates a cash register, cash drawer or other depository on the adult business premises where cash funds or records of credit card or other credit transactions generated in any manner by the operation of the establishment or the activities conducted therein are kept;

"b. Displays or takes orders from any customer for any merchandise, goods, entertainment or other services offered on the adult business premises;

"c. Delivers or provides to any customer any merchandise, goods, entertainment or other services offered on the adult business premises;

"d. Acts as a door attendant to regulate the entry of customers or other persons into the business premises; and

"e. Supervises or manages other persons in the performance of any of the foregoing activities on the business premises.

"2. Entertainment.

"Any act or performance, such as a play, skit, reading, revue, pantomime, scene, song, dance, musical rendition or strip tease, whether performed by employees, agents, contractors or customers. The term entertainment shall also mean bartenders, waiters, waitresses or other employees exposing specified anatomical areas or engaging in specified sexual activities in the presence of customers.

" . . .

"D. Any adult bookstore, adult motion picture theater or nude live entertainment club lawfully in existence on February 10, 1987, and not in compliance with the zoning provisions of the City Code, shall be deemed a nonconforming use and shall comply with all of the provisions of the zoning code regulating such uses by February 10, 1988. In the case of any such uses being located within one thousand feet of each other, the use first established and continually operating shall be allowed to operate at its location, provided such use complies with all other provisions of the zoning code.

" . . .

"F. The regulations in this zoning code of adult bookstores, adult motion picture theaters and nude live entertainment clubs are intended to be land use controls meant to regulate the harmful secondary effects of such uses only, and shall not be construed as being intended to limit access by adults to sexually oriented material, activity or expression, protected by the First Amendment of the United States Constitution." EL PASO CITY CODE § 20.08.080.

A violation of the ordinance is punishable by a fine not to exceed $2,000. *Id.* § 20.68.010.

thousand feet of a school. ... [S]everal female employees ... were exposing all of their breasts and most of their buttocks. All known employees and persons in a managerial capacity were cited" by the inspectors.[2] The complaint in the municipal court alleged that the appellant:

> did ... unlawfully conduct business in the establishment situated at 3802 PERSHING and known by the name of ALDOS (a nude live entertainment club) that was located within one thousand feet of: A school, to wit: ST. JOSEPH'S PAROCHIAL SCHOOL; Said defendant provided entertainment on said adult business premises by exposing a "specified anatomical area", as that term is defined in Section 20.02.764 of the El Paso City Code. [Punctuation *sic.*]

Conviction and a $500 fine in the municipal court were followed by appeal to the municipal court of appeals, which affirmed.[3] The Eighth Court of Appeals reversed and ordered the complaint dismissed because it did not allege a culpable mental state. *See Aguirre v. State*, 978 S.W.2d 605 (Tex.App.—El Paso 1998). We granted discretionary review.

## II.

■ Since a dissenting opinion says the petition for discretionary review should be dismissed because the state prosecuting attorney lacks "standing" to file it (*see post*), we pause to clarify the authority of the state prosecuting attorney to petition for discretionary review in a case such as this.

As the first sentence of Government Code Section 42.001 states, "The court of criminal appeals shall appoint a state prosecuting attorney to represent the state in *all* proceedings before the court." We have emphasized the word "all," which literally gives the state prosecuting attorney authority to represent the State in every case in this Court. That authority could be limited only by some more specific law. Judge Johnson infers such a limitation by applying the maxim "expressio unius est exclusio alterius" to Section 42.005. But if Section 42.005 is correctly understood, the maxim cuts against that conclusion.

The source of Section 42.005 is a 1981 act which implemented a constitutional amendment that gave the courts of appeals jurisdiction in criminal cases.[4] The 1981 act continued the state prosecuting attorney's authority to represent the State in all proceedings before the Court of Criminal Appeals, an authority which is now codified in the first sentence of Government Code Section 42.001(a). The act gave the state prosecuting attorney authority to provide assistance to district and county attorneys in representing the State before the courts of appeals when requested to do so by the district or county attorney; that authority is now codified in Government Code Section 42.005(a). The act made it clear that the state prosecuting attorney's authority to appear in the courts of appeals is not dependent on a request from a district or county attorney: "The State Prosecuting Attorney may also represent the State in any stage of a criminal case before the Courts of Appeals when, in his judgment, the interests of the State so require." That sentence is now

2. The other citations, and another group of citations which the inspectors issued at Aldo's on October 6, 1988, led to appeals in fourteen companion cases in which the Court of Appeals also ordered dismissal of the complaints. We have granted discretionary review of those cases, which will be disposed of in accordance with the judgment in this case.

3. The appeals from the municipal court to the municipal court of appeals were abated for nearly five years while the affected businesses unsuccessfully prosecuted civil-rights actions in the federal courts *See Aguirre v. State*, 978 S.W.2d 605, 606 n. 2 (Tex.App.—El Paso 1998), (citing *Woodall v. City of El Paso*, 49 F.3d 1120 (5th Cir.), *cert. denied*, 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 425 (1995)).

4. *See* Act of June 8, 1981, 67th Leg., R.S., ch. 291, § 30, 1981 Tex. Gen. Laws 761, 776, *repealed by* the Title 2, Government Code Act, 69th Leg., R.S., ch. 480, § 1, chapter 42, 1985 Tex. Gen. Laws 1720, 1921–22.

codified as the second sentence of Government Code Section 42.001(a).

The 1981 act also said, "District and county attorneys may provide assistance to the state prosecuting attorney in representing the State before the Court of Criminal Appeals." That sentence is now codified in Government Code Section 42.005(b). Since the act gives district and county attorneys, but not city attorneys, authority to assist the state prosecuting attorney in representing the State before this Court, the maxim "expressio unius est exclusio alterius" would suggest that city attorneys are not authorized even to assist the state prosecuting attorney in this Court, much less to usurp the state prosecuting attorney's general authority to represent the State in all cases in this Court.

There is a specific statute which must be considered: the El Paso Courts Act,[5] which is now codified as Chapter 30, Subchapter D of the Government Code. The Act created municipal courts of record and a municipal court of appeals in the City of El Paso. The purpose of the Act was to change the method of appeal from conviction in the municipal court. The normal appeal to the county court for trial *de novo*[6] was replaced by an appeal on the record to a municipal court of appeal. Section 30.00145 of the Act says that "all appeals from convictions in the municipal court of record must be prosecuted in the appellate court, the court of appeals, or the court of criminal appeals by the city attorney or an assistant city attorney." The dissent would hold that this section deprives the state prosecuting attorney of authority to represent the State in the courts of appeals and in this Court. We think the proper construction of this section requires an appreciation of the history of the municipal court's jurisdiction. In the historical context, Section 30.00145 is another in a series of statutes which divide the prosecutorial authority of the State between the municipal attorney and the county attorney or district attorney.

The Texas Constitution of 1876 required that cities and towns having a population of ten thousand or less could be chartered only by general law.[7] By implication, cities with larger populations could be, and were, chartered by special acts of the legislature. The legislative charters provided for courts (or recorders or mayors who acted as judges). Each city's court had jurisdiction of offenses against city ordinances. Some charters also gave the city courts jurisdiction of certain offenses against state law, concurrently with the justice courts or even with the county court.[8] Some charters also gave city

5. Act of June 19, 1983, 68th Leg., R.S., ch. 685, 1983 Tex. Gen. Laws 4290, *repealed by* the Title 2, Government Code Act, 69th Leg., R.S., ch. 480, § 26, 1985 Tex. Gen. Laws 1720, 2048, *codified by id.*, ch. 480, § 1, chapter 30, subchapter B, 1985 Tex. Gen. Laws 1720, 1833.

6. "The county courts shall have appellate jurisdiction in criminal cases of which justice courts and other inferior courts have original jurisdiction." Tex.Code Crim. Proc. art. 4.08.
   "In all appeals to a county court from justice courts and municipal courts other than municipal courts of record, the trial shall be de novo in the trial in the county court, the same as if the prosecution had been originally commenced in that court." *Id.*, art. 44.17.

7. *See* Tex. Const. art. XI, § 4 (amended 1909 & 1920). The 1909 amendment reduced the maximum population to five thousand. *See* 31st Leg., R.S., S.J.R. 6.

8. For example, the charter of the City of Waco gave "the police court of the city of Waco ... a criminal jurisdiction only as follows:
   "... To have concurrent jurisdiction with the justice and county courts over all misdemeanors arising under the criminal laws of the State, within the city limits, in which the punishment is by fine only, or by fine or imprisonment, or by both; except theft, swindling, embezzlement, and those involving official misconduct; and the mayor or judge of said court shall in addition also be ex-officio Justice of the peace and possess and execute in the city, in criminal cases, all the powers and duties of a Justice of the peace." Act of March 25, 1891, 22d Leg., R.S., ch. 12, § 1, sec. 15(15), 1891 Tex. Spec. Laws 27.

courts exclusive jurisdiction of certain offenses against state law.[9] These provisions created "vexed questions" of constitutional law.[10] Could the legislature create such courts? Could the courts have concurrent jurisdiction of offenses against state laws? Exclusive jurisdiction? In whose name would the prosecution be brought? Who would prosecute the cases? These issues persisted all through the last decade of the nineteenth century. They were resolved only after the constitution was amended, statutes were enacted, and a decision of this Court was overruled to eliminate a conflict between the state's highest courts.[11]

9. For example, the Dallas City Court was given "exclusive jurisdiction over disorderly houses and female vagrants." Act of March 13, 1889, 21st Leg., R.S., ch. 2, § 1, 1889 Tex. Spec. Laws 31. The Fort Worth City Court was given "exclusive jurisdiction over, and [sic] violation of the Sunday laws between the hours of 12 o'clock Saturday night and 9 o'clock Sunday morning and between the hours of 4 o'clock p.m. Sunday and 12 o'clock Sunday night." Act of April 3, 1891, 22d Leg., R.S., ch. 8, § 1, sec. 26, 1891 Tex. Spec. Laws 9, 9–10.

10. See Jackson v. Swayne, 92 Tex. 242, 246, 47 S.W. 711, 712 (1898); Ex parte Coombs, 38 Tex.Crim. 648, 655, 44 S.W. 854, 857 (1898) (opinion of Davidson, J.).

11. In a way, the origin of the confusion was Ex parte Towles, 48 Tex. 413 (1877), in which the Supreme Court held unconstitutional an act giving any voter in an election for county-seat the right to appeal an election contest from the commissioner's court to the district court. The Court said that the judicial system established in the Constitution of 1876 was "complete" and "permanent, and not subject to change by the action of the Legislature, except as a change may have been provided for." Id. at 439. Since appeal from the commissioner's court to the district court was not provided for in the Constitution, an act creating such an appeal was therefore unconstitutional.

The Court of Appeals applied the reasoning of Towles to the legislative charter for the City of Fort Worth, which gave the city court exclusive jurisdiction of violations of the state "Sunday laws." See Act of April 3, 1891, supra note 9. The Court held the provision unconstitutional because it would diminish the constitutional jurisdiction of the justice of the peace courts in a way not provided for in the Constitution. Ginnochio v. State, 30 Tex. App. 584, 18 S.W. 82 (1891). Then the Court of Criminal Appeals held that the same charter could not constitutionally give the city court jurisdiction of state law violations concurrent with the justice of the peace courts. Leach v. State, 36 Tex.Crim. 248, 36 S.W. 471 (1896). Likewise, the Court held that the charter of the City of Galveston could not constitute the recorder an ex officio justice of the peace. Ex parte Knox, 39 S.W. 670 (Tex. Cr.App.1897).

The Supreme Court reached the opposite conclusion. Harris County v. Stewart, 91 Tex. 133, 137–47, 41 S.W. 650, 653–57 (1897). The Supreme Court said that, because of its holding in Towles, the "courts and lawyers were in constant trouble as to the jurisdiction of courts, which greatly embarrassed the administration of justice," and that the constitution had been amended in 1891 "for the purpose of ridding the state of the incubus which the [holding of Towles] had saddled upon it." Id. at 141–42, 41 S.W. at 655. The Supreme Court concluded that the 1891 amendment had placed the subject of jurisdiction "at the complete disposal of the legislature as far as inferior courts are concerned." Id. at 142, 41 S.W. at 655. Therefore the recorder of the City of Houston had jurisdiction of offenses against state law.

The 1891 amendment to which the Supreme Court referred added a second paragraph to Article V, Section 1 of the Constitution: "The Legislature may establish such other courts as it may deem necessary and prescribe the jurisdiction and organization thereof, and may conform the jurisdiction of the district and other inferior courts thereto."

The Court of Criminal Appeals promptly reconsidered the amendment and the Supreme Court's construction of it, and held again that the Constitution did not permit the legislature to give a city court jurisdiction of an offense against state law. See Coombs v. State, 38 Tex.Crim. 648, 44 S.W. 854 (opinion of Davidson, J.), 47 S.W. 163 (opinion of Henderson, J.) (1898); Ex parte Fagg, 38 Tex. Crim. 573, 44 S.W. 294 (1898).

In 1899 a comprehensive statute was enacted to create municipal courts and to give them uniform jurisdictions and procedures. Act of April 1, 1899, 26th Leg., R.S., ch. 33, 1899 Tex. Gen. Laws 40. In the emergency clause of the act, the Legislature found that "there exists great doubt and confusion concerning the jurisdiction of municipal courts as now established." Id., § 19, 1899 Tex. Gen. Laws at 44. The act gave municipal courts jurisdiction of offenses against state law. (It also prescribed the duty and authority to prosecute, as is discussed in the text, below.)

The statute that we are considering addresses one of the questions that was involved in the nineteenth-century dispute: who should prosecute in the city court? In 1897 the confusion in the law was such that the Tarrant County attorney and the Forth Worth city attorney were both appearing in the corporation court, vying for the right to prosecute offenses against state law.[12] In Houston the city attorney appeared, but the county refused to pay him for prosecuting such cases when statutes required payments of fees for like services in justice courts.[13] In the ensuing litigation, the highest courts of the state reached opposite conclusions about the jurisdiction of city courts.[14]

The next legislature addressed the problem. A statute was enacted to create, in each city, town, and village, a corporation court. In addition to jurisdiction of criminal cases arising under ordinances, the corporation courts were given jurisdiction, concurrent with the justice of the peace, of criminal cases arising under state law.[15] Section 8 of the act provided:

That all prosecutions in said court, whether under an ordinance or under the provisions of the Penal Code ... shall be conducted by the city attorney of such city, town or village, or by his deputy; but the county attorney of the county in which said city, town or village is situated may, if he so desires, also represent the State of Texas in such prosecutions, but in all such cases the said county attorney shall not be entitled to receive any fees or other compensation whatever, for said services, and in no case shall the said county attorney have the power to dismiss any prosecution pending in said court, unless for reasons filed and approved by the recorder of said court.

The substance of this provision, like that of many other provisions of the 1899 act, is still in effect.[16]

▆▆▆ When this statute is read together with the statute that gives the county attorney the duty to represent the State in all criminal cases in courts below the grade of the Code of Criminal Procedure, and which says the court in which the complaint is first filed shall retain jurisdiction.

The constitutionality of the act was in doubt until this Court decided that the Constitution permitted jurisdiction of state offenses to be given to municipal courts in the act. *Ex parte Wilbarger,* 41 Tex.Crim. 514, 55 S.W. 968 (1900). *Accord, Ex parte Hart,* 41 Tex.Crim. 581, 56 S.W. 341 (1900). This decision was contrary to the Court's earlier decision in *Leach v. State, supra,* and later the Court expressly overruled *Leach.* *See Ex parte Abrams,* 56 Tex.Crim. 465, 120 S.W. 883 (1908).

The *Wilbarger* Court reserved the issue of the constitutionality of that section of the act that authorized county attorneys to prosecute in municipal courts and further provided that they take nothing for their services. *See* 41 Tex.Crim. at 520, 55 S.W. at 971. But the authority of a county attorney to appear in a municipal court to prosecute under state law seems clear. *See ibid; Howth v. Greer,* 40 Tex.Civ.App. 552, 90 S.W. 211 (1905, writ ref'd) (also upholding the constitutionality of the no-fee provision).

The 1899 act which this Court upheld addressed all the questions but one: which court has jurisdiction when complaints are filed in both municipal court and justice court? This was resolved in 1903 by enactment of the statute which is now Article 4.16

**12.** See *Jackson v. Swayne,* 45 S.W. 619 (Tex. Civ.App.—Fort Worth), *rev'd and dism'd,* 92 Tex. 242, 47 S.W. 711 (1898).

**13.** See *Harris County v. Stewart,* 91 Tex. 133, 41 S.W. 650 (1897).

**14.** See *supra* note 11.

**15.** Act of April 1, 1899, 26th Leg., R.S., ch. 33, §§ 1 & 2, 1899 Tex. Gen. Laws 40, 40–41.

**16.** All prosecutions in a municipal court shall be conducted by the city attorney of such city, town or village, or by his deputy. The county attorney of the county in which said city, town or village is situated may, if he so desires, also represent the State in such prosecutions. In such cases, the said county attorney shall not be entitled to receive any fees or other compensation whatever for said services. The county attorney shall have no power to dismiss any prosecution pending in said court unless for reasons filed and approved by the judge.
TEX.CODE CRIM. PROC. art. 45.03.

of district court,[17] the responsibility and authority for municipal court prosecutions is clear: In the municipal court the city attorney has the right and duty to prosecute, and the county attorney has the right, but not a duty, to prosecute. In the county court, the county attorney has the right and duty to prosecute, and this duty includes the duty to prosecute appeals from the municipal court.[18]

Section 30.00145 of the Government Code, which was enacted when the Municipal Court of El Paso was made a court of record, gives the city attorney of El Paso, rather than the county attorney, the authority and the duty to prosecute appeals from the municipal court of record. This is a departure from the general division of responsibilities and authority that was established a hundred years ago, and we think this change is the purpose of Section 30.00145. In light of the history of the law, we do not think Section 30.00145 was intended to, or should be read to, usurp the authority of the state prosecuting at-

torney in this Court. Therefore we conclude that the state prosecuting attorney has authority to petition this Court for discretionary review of an appeal from a municipal court of record.

We observe that this history also refutes the dissent's argument that prosecutions in municipal courts "do not affect areas outside of that municipality and so do not impact 'the interest of the state.'" *Post* at 481. Insofar as this ordinance creates a criminal offense, the State not only has an interest; its interest is paramount.

This was settled in 1899. Before that time, the legislature attempted to create cities with their own judicial power, vested in courts that were not part of the judicial branch of state government.[19] Prosecutions in some municipal courts were brought, "In the name and by authority of the city," and process issued in the name of the city.[20] This Court held that such provisions were unconstitutional as to prosecutions for violations of state laws.[21]

---

**17.** "The county attorney shall attend the terms of court in his county below the grade of district court, and shall represent the State in all criminal cases under examination or prosecution in said county . . . ." Tex.Code Crim. Proc. art. 2.02.

**18.** Op. Tex. Att'y Gen. No. WW–1302 (1966). In 1987, an act of the legislature amended Article 45.03 of the Code of Criminal Procedure to allow that, "With the consent of the county attorney, appeals from municipal court to a county court, county court at law, or any appellate court may be prosecuted by the city attorney or his deputy." Act of June 20, 1987, 70th Leg., R.S., ch. 923, § 1, 1987 Tex. Gen. Laws 3113. This act permits, but does not require, the city attorney to assume the county attorney's duty to prosecute appeals from the municipal court.

**19.** See, *e.g.*, Act of March 17, 1889, 21st Leg., R.S., ch. 2, 1889 Tex. Spec. Laws 31 ("The judicial power of the city of Dallas shall be, and the same is hereby vested in a court to be known as the Dallas City Court"); Act of March 25, 1891, 22d Leg., R.S., ch. 12, § 1, sec. 15(15), 1891 Tex. Spec. Laws 25, 27 ("The judicial powers of the city of Waco shall be and the same is hereby vested in a court to be known as the police court of the city of Waco"); Act of April 3, 1891, 22d Leg., R.S.,

ch. 8, § 1, sec. 26, 1891 Tex. Spec. Laws 9 ("The judicial power of the city of Fort Worth shall be and the same is hereby vested in a Court to be known as the Fort Worth City Court").

**20.** See *e.g.*, Act Incorporating City of Dallas, 21st Leg., R.S., ch. 1, § 27, 1889 Tex. Spec. Laws 1, 7 ("All process of said court shall run in the name of the city of Dallas"); Act Incorporating City of Fort Worth, 21st Leg., R.S., ch. 5, § 26, 1889 Tex. Spec. Laws 64, 70 ("All prosecutions for violation of the city ordinances shall be carried on in the name and by authority of 'The city of Fort Worth,' and conclude 'Against the peace and dignity of the city'"); Act of April 3, 1891, 22d Leg., R.S., ch. 8, § 1, sec. 28, 1891 Tex. Spec. Laws 9, 10 ("All process of said court shall run in the name and by the authority of the City of Fort Worth and shall conclude against the peace and dignity of the city").

**21.** *Leach v. State,* 36 Tex.Crim. 248, 253–54, 36 S.W. 471, 473–74 (1896). The requirement that all prosecutions be carried on in the name of the State of Texas was deleted from article V., § 12 of the Constitution in 1985. It remains in article 1.23 of the Code of Criminal Procedure.

The purposes of the constitutional amendment of 1891 and the legislation of 1899 that created corporation courts were to make it clear that municipal courts were creatures of the State and that prosecutors in those courts acted with the authority of the State.[22] Accordingly the legislature decided that all municipal prosecutions would be "In the name and by authority of the State of Texas." [23] It continues to be the law that, "All prosecutions shall be carried on 'in the name and by authority of The State of Texas', and conclude, 'against the peace and dignity of the State,'" in every court, specifically including municipal courts and the municipal court of record of El Paso.[24]

To enforce an ordinance by means other than criminal prosecution, a home-rule municipality may bring a civil action.[25] But a criminal action is brought to enforce the State's interest.

### III.

■ The issue in this case is resolved by the application of Section 6.02 of the Penal Code:

(a) Except as provided in Subsection (b). a person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires.

(b) *If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element.* [Emphasis added.]

(c) If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required under Subsection (b), intent, knowledge, or recklessness suffices to establish criminal responsibility.

(d) Culpable mental states are classified according to relative degrees, from highest to lowest, as follows: (1) intentional; (2) knowing; (3) reckless; (4) criminal negligence.

(e) Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged.

Section 6.02, which is in Title 2 of the Penal Code, is made applicable to municipal ordinances by Section 1.03(b): "The provisions of Titles 1, 2, and 3 apply to offenses defined by other laws, unless the statute defining the offense provides otherwise ...." *See Honeycutt v. State,* 627 S.W.2d 417, 422 (Tex.Cr.App.1982).

Therefore a culpable mental state is required for the El Paso ordinance, even though it does not prescribe one, unless the definition of the offense plainly dispenses with any mental element. *See* Penal Code § 6.02(b).[26]

---

**22.** This is the very reason why this Court upheld the constitutionality of the municipal courts. "In the view we take of this question, the the legislature [*sic*], in the exercise of its constitutional powers, properly created corporation courts for cities, town [*sic*], and villages in this state, and authorized such cities, towns and villages to adopt such courts. This was done by creative act, and not merely by attempting to confer jurisdiction upon municipal courts." *Ex parte Wilbarger,* 41 Tex.Crim. 514, 520, 55 S.W. 968, 971 (1900).

**23.** Act of April 1, 1899, *supra* note 15, § 8, 1899 Tex. Gen. Laws at 42.

**24.** Tex.Code Crim. Proc. art. 1.23 (punctuation *sic*). *See id.,* art. 45.03 (same requirement for complaints in municipal court); Tex. Gov't

Code § 30.00133(a) ("Proceedings in [El Paso's] municipal courts of record must be commenced by a complaint that begins: 'In the name and by authority of the State of Texas,' and concludes; 'Against the peace and dignity of the State of Texas'"), *repealed by* Act of June 18, 1999, 76th Leg., R.S., ch. 691, § 139(3), 1999 Tex. Gen. Laws 3263, 3290. The requirement for pleadings in article 1.23 is now applicable to all municipal courts of record. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 691, § 1, sec. 30.000126, 1999 Tex. Gen. Laws 3263, 3267.

**25.** *See* Tex. Local Gov't Code § 54.012(8).

**26.** In *Honeycutt v. State,* 627 S.W.2d at 423–24, we held that the power to define offenses in abrogation of Titles 1, 2, and 3 of the Penal

The statement in Penal Code Section 6.02(b), that a culpable mental state is required unless the definition plainly dispenses with any mental element, is typical of the "[s]everal modern codes [which] have provided that a statute is not to be treated as a strict liability statute unless it 'clearly indicates' or 'plainly appears' that such a result was intended by the legislature." [27]   Section 6.02(b) serves to define the issue: Whether the definition of the offense plainly dispenses with any mental element.   The task of resolving that issue may be accomplished by considering a number of features of the statute.

The conclusive feature would be an affirmative statement in the statute that the conduct is a crime though done without fault.   A legislature could make such a statement, but it rarely if ever does so.[28]   The typical strict liability statute is "empty"—it simply says nothing about a mental state.[29]

The legislative history of Section 6.02(b) makes it clear that that feature of a statute—the mere omission of a mental element—cannot be construed to plainly dispense with a mental element.   There is an explicit discussion of this point in the comments of the Penal Code Revision Committee which drafted Section 6.02.   Since the subsections with which we are concerned, subsections (a), (b), and (c), were enacted without substantive change, the drafters' comments are the most important expression of the legislative history of those subsections.[30]

The drafters said, in *Texas Penal Code: A Proposed Revision* 40 (Final Draft 1970) (emphasis added):

Subsection (a), in restating Penal Code art. 39, preserves for the new code the traditional mens rea requirement of the criminal law.   Moreover, Subsection (b) imbues this requirement with the force of a presumption because, as the Court of Criminal Appeals aptly phrased it, "The punishment of one for an offense when he is able to show that the act was done without guilty knowledge or intent is contrary to the general principles of criminal law . . . ." *Vaughn v. State*, 86 Tex.Crim. 255, 219 S.W. 206, 208 (1919); [other citations omitted].   *Despite Subsection (b), of course, the legislature is free to dispense with the requirement of a culpable mental state—as it has done in creating the so-called strict liability offenses,* e.g., *Neill v. State*, 225 S.W.2d 829 (Tex.Crim.App. 1949) (adulterated food); *Goodwin v. State*, 63 Tex.Crim. 140, 138 S.W. 399 (1911) (speeding)—*but its intent to eliminate mens rea must be manifest.*   [Emphasis added.]   See *Stalling v. State*, 90 Tex.Crim. 310, 234 S.W. 914 (1921) [ (although statute requiring driver of automobile to stop and render aid did not include element of knowledge, lack of knowledge would be a defense) ];   cf. Bloom v. Texas State Bd. of Pharmacy, 390 S.W.2d 252 (Tex.1965) [ (although statute authorizing suspension of pharmacist's license for misconduct did not mention knowledge, it did not dispense with scienter) ].

Code, which include the culpable mental state requirements, is reserved to the legislature. Therefore a municipality must comply with Section 6.02 when it prescribes, or dispenses with, a culpable mental state in an offense.

27.   1 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW 343 n. 10 (2d ed.1986).

28.   *See id.* at 342.

29.   *See id.* at 343.   The Assistant General Counsel of the United States Department of Health & Human Services has instructed at-

torneys to draft empty statutes. "The typical way to draft a strict liability provision is illustrated by section 368 of the Public Safety Health Act, 42 U.S.C. 271, which reads, 'Any person who violates any (quarantine) regulation . . . shall be punished . . . .' " DONALD HIRSCH, DRAFTING FEDERAL LAW 18 (1980).

30.   *See* SETH S. SEARCY, III, *Foreword*, 1 VERNON'S TEXAS CODES ANNOTATED—PENAL CODE xix, xxiv (1974).

If the definition of an offense is silent about whether a culpable mental state is an element of the offense, Subsection (b) presumes that one is and Subsection (c) requires that it amount at least to recklessness.

■ Accordingly we hold that a court must look for a manifest intent to dispense with the requirement of a culpable mental state, and that the silence of a statute about whether a culpable mental state is an element of the offense leaves a presumption that one is.

In the absence of an express intent to dispense with the requirement of a culpable mental state, we next ask whether such an intent is manifested by other features of the statute.

Justice Jackson's remark in *Morissette v. United States*, 342 U.S. 246, 260, 72 S.Ct. 240, 96 L.Ed. 288 (1952), regrettably, still applies: "Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not. We attempt no closed definition, for the law on the subject is neither settled nor static."

One feature of a statute is obvious, but it should not be overlooked: whether it makes a strict-liability offense a crime. Strict liability is frequently associated with torts, regulations, and "civil offenses" which impose a penalty but that are not crimes. Some commentators insist that strict liability has no place, or should have no place, in the law of crimes.[31] Such views influenced the American Law Institute in drafting the Model Penal Code, in which a strict liability offense must be classified as a "violation," *see* Model Penal Code § 2.05, and "[a] violation does not constitute a crime," *id.* § 1.04(5).

■ Texas penal law has not decriminalized strict liability offenses. Many are Class C misdemeanors, a conviction for which does not impose any legal disability or disadvantage.[32] But the offenses are still crimes, and "the fact is that the person charged can be arrested on warrant like any ordinary criminal, forced to travel a long distance to attend the court, remanded in custody and imprisoned in default of payment of the fine."[33] The choice of the legislative and executive branches of our government to classify all offenses as crimes, and to subject offenders to such procedural consequences, supports the general presumption against strict liability.

The language of the statute is, of course, to be considered. "It is particularly significant when some such word as 'knowingly' is used in one section of a statute and omitted from another."[34] An example is The Meat Inspection Law of 1945.[35] The act defined criminal offenses in four consecutive sections. The first three sections

---

**31.** "In view of the nature of criminal conduct, there is no avoiding the conclusion that strict liability cannot be brought within the scope of criminal law. This has been widely recognized by those who ... wish to distinguish 'real' criminal law from that of 'public welfare offenses.'" JEROME HALL, GENERAL PRINCIPLES OF CRIMINAL LAW 336 (1960). "The whole problem ... arises from using the criminal process for a purpose for which it is not suited." GLANVILLE WILLIAMS, CRIMINAL LAW 264 (2d ed.1961). *See* ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 910 (3d ed.1982) (due process is denied by conviction based on liability without fault).

**32.** *See* TEX. PENAL CODE § 12.03(c).

**33.** WILLIAMS, *supra* note 31, at 259. *See* TEX. CODE CRIM. PROC. art. 14.01(b) (peace officer may arrest for any offense committed within his view); *id.* art. 15.03(a) (magistrate may issue warrant of arrest for any offense against the laws of the State); *Williams v. State,* 726 S.W.2d 99, 100–01 (Tex.Cr.App.1986) (custodial arrest is authorized for offense of parking on wrong side of street).

**34.** PERKINS & BOYCE, *supra* note 31, at 882 n. 16.

**35.** The Meat Inspection Law, 49th Leg., R.S., ch. 339, 1945 Tex. Gen. Laws 554, *replaced by* TEX. HEALTH & SAFETY CODE ch. 433.

made it unlawful "to knowingly sell" meat from diseased animals,[36] "to knowingly slaughter" diseased animals,[37] and "to knowingly sell or offer to sell" meat from animals that died other than by slaughter.[38] The fourth section made it unlawful simply "to sell" meat from animals such as horses.[39] The omission of a culpable mental state from only one of the four sections was a clear implication of the legislature's intent to dispense with a mental element in that section. This Court had no difficulty in concluding that a culpable mental state was not part of the offense defined in that section. *See Neill v. State,* 154 Tex. Crim. 549, 552, 229 S.W.2d 361, 363 (1950).

Another factor could be the classification of an offense as *malum in se* or *malum prohibitum.* Some courts have found an historical correlation between the requirement of fault and an offense's being *ma-*

*lum in se.*[40] The implication is that a strict liability offense must be *malum prohibitum.* The more recent decisions discount the classification of an offense as *malum prohibitum.*[41] As we shall remark below, however, the relationship of the offense to public mores and resentment is a factor.[42]

The most important factor in the more recent cases is the subject of the statute. Strict liability is traditionally associated with the protection of public health, safety, or welfare.

The crimes there involved depend on no mental element but consist only of forbidden acts or omissions. This ... is made clear from examination of a century-old but accelerating tendency, discernible both here and in England, to call into existence new duties and crimes which disregard any ingredient of intent.

36. *Id.,* § 15.

37. *Id.,* § 16.

38. *Id.,* § 17.

39. *Id.,* § 18.

40. For example, in *United States v. Balint,* 258 U.S. 250, 252, 42 S.Ct. 301, 66 L.Ed. 604 (1922), the Court said:

It has been objected that punishment of a person for an act in violation of law when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in *Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 69, 70, 30 S.Ct. 663, 54 L.Ed. 930, in which it was held that in the prohibition or punishment of particular acts, the State may in the maintenance of a public policy provide "that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance." Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se.

*See* HALL, *supra* note 31, at 337–38; PERKINS & BOYCE, *supra* note 31, at 880 *et seq.;* 1 CHARLES A. TORCIA, WHARTON'S CRIMINAL LAW 123 (15th ed.1993).

41. *See, e.g., Morissette v. United States,* 342 U.S. at 259–60, 72 S.Ct. 240:

It was not until recently that the Court took occasion more explicitly to relate abandonment of the ingredient of intent, not merely with considerations of expediency in obtaining convictions, nor with the *malum prohibitum* classification of the crime, but with the peculiar nature and quality of the offense. We referred to "... a now familiar type of legislation whereby penalties serve as effective means of regulation," and continued, "such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." But we warned: "Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting." *United States v. Dotterweich,* 320 U.S. 277, 280–281, 284, 64 S.Ct. 134, 88 L.Ed. 48.

Professor Hall insisted, "If strict liability rests on any rational ground, it must be sought elsewhere than in 'mala prohibita.'" HALL, *supra* note 31, at 342.

"[T]he important differences [between offenses *mala in se* and *mala prohibita* ] ... point irresistibly to just one conclusion: "**An offense malum prohibitum is not a crime.**" PERKINS & BOYCE, *supra* note 31, at 886 (emphasis in original).

42. See text accompanying note 56, *infra.*

The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, and even securities, did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

While many of these duties are sanctioned by a more strict civil liability, lawmakers, whether wisely or not, have sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions. This has confronted the courts with a multitude of prosecutions, based on statutes or administrative regulations, for what have been aptly called "public welfare offenses." These cases do not fit neatly into any of such accepted classifications of common-law offenses, such as those against the state, the per-son, property, or public morals. Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.[43]

43. *Morissette v. United States*, 342 U.S. 246, 252–54, 72 S.Ct. 240, 96 L.Ed. 288 (1952). *Cf.* G.C. Thornton, Legislative Drafting 282 (2d ed.1979):

It has become customary in certain fields for offences of strict liability to be created. This is because the subject-matter in these areas is such that it is considered justifiable to demand a high standard of positive care and control in the interests of society as a whole. Thus, a penal provision phrased in absolute terms is likely to be construed as one of strict liability where the statute is concerned to regulate food and drugs, poisons, animal foods, fertilizers, weights and measures, merchandise marks, public health, and building requirements. Nevertheless, although the statute may be dealing with a grave social evil, strict liability is not likely to be construed as intended where its imposition would not improve the observance of the law.

While recognizing that strict liability is imposed "in such various forms, that it is impossible to generalize about it," one writer found it "possible to hazard certain more significant generalizations regarding the public welfare offenses."

First, many of the enactments apply not to the general public but only to certain traders, particularly to suppliers of food or drugs and vendors of alcoholic beverages. Others, having more general application as to potential offenders, are restricted to very few activities—the operation of automobiles, safety of highways, hunting, fishing, and various health measures. Next, many of these regulations and the conditions of conforming to them presuppose a continuous activity, such as carrying on a business.[44] This implies that general standards regarding such conduct are important rather than isolated acts. Third, the public welfare enactments are relatively new. They represent relatively recent adaptations to an intricate economy, including an impersonal market. Although analogous control dates at least from the guilds, violations under conditions of trade prevailing in primary groups are more readily recognized as immoral. Thus, fourth, the modern regulations are not strongly supported by the mores. Their occurrence does not arouse the resentment directed at the perpetrators of traditional crimes.[45]

Another writer observed recently, "Strict liability offenses include, not only those that are regulatory, public welfare, or mala prohibita in nature, but also those for example that are designed to protect children."[46]

Our own decisions reflect these traditions by finding statutes to impose strict liability as to entire offenses affecting public health and safety,[47] and as to the element of a child's age in statutes that protect children.[48]

Professor LaFave collects "a number of factors [that] may be considered of importance in deciding whether the legislature meant to impose liability without fault or, on the other hand, really meant to require fault though it failed to spell it out clearly."[49] One of these factors we already have considered: the guidance given in Penal Code § 6.02(b). The others are:

(1) The legislative history of the statute or its title or context may throw some light on the matter. (2) The severity of the punishment provided for the crime is of importance. Other things being

**44.** In such an activity "(*a*) special skill and attention may reasonably be demanded, and (*b*) if the law is broken there will be a suspicion that it was a deliberate breach due to self-interest." WILLIAMS, *supra* note 31, at 235 (and quoting *Measure for Measure*, III, i: "Oh, fie, fie, fie! Thy sin's not accidental, but a trade").

**45.** HALL, *supra* note 31, at 330–31 (footnote omitted).

**46.** *See* PERKINS & BOYCE, *supra* note 31, at 884–85; 1 TORCIA, *supra* note 39, at 127; WILLIAMS, *supra* note 31, at 239–44.

**47.** *See American Plant Food Corp. v. State*, 587 S.W.2d 679 (Tex.Cr.App.1979) (water pollution); *Owen v. State*, 525 S.W.2d 164 (Tex.Cr. App.1975) (driving while intoxicated); *Neill v. State*, 154 Tex.Crim. 549, 552, 229 S.W.2d 361, 363 (1949) (sale of horsemeat for human consumption); *Neill v. State*, 225 S.W.2d 829 (Tex.Cr.App.1949) (adulterated food); *Goodwin v. State*, 63 Tex.Crim. 140, 138 S.W. 399 (1911) (speeding).

**48.** *See Zubia v. State*, 998 S.W.2d 226 (Tex.Cr. App. 1999) (in offense of injury to child, culpable mental state does not apply to age of child, and implying that same is true for offense of capital murder of child younger than six); *Johnson v. State*, 967 S.W.2d 848 (Tex. Cr.App.1998) (same for offense of indecency with child); *Roof v. State*, 665 S.W.2d 490, 491 (Tex.Cr.App.1984) (same).

"[From such cases] it will be seen that we cannot classify crimes exclusively into crimes of strict responsibility and crimes requiring fault. The same crime may be of strict liability in respect of one element and require fault in respect of another." WILLIAMS, *supra* note 31, at 244.

**49.** *See* 1 LaFAVE & SCOTT, *supra* note 27, at 342.

equal, the greater the possible punishment, the more likely some fault is required; and, conversely, the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.[50] (3) The seriousness of harm to the public which may be expected to follow from the forbidden conduct is another factor. Other things being equal, the more serious the consequences to the public, the more likely the legislature meant to impose liability without regard to fault, and vice versa. (4) The defendant's opportunity to ascertain the true facts is yet another factor which may be important in determining whether the legislature really meant to impose liability on one who was without fault because he lacked knowledge of these facts. (5) The difficulty prosecuting officials would have in proving a mental state for this type of crime. The greater the difficulty, the more likely it is that the legislature intended to relieve the prosecution of that burden so that the law could be effectively enforced. (6) The number of prosecutions to be expected is another factor of some importance. The fewer the expected prosecutions, the more likely the legislature meant to require the prosecuting officials to go into the issue of fault; the greater the number of prosecutions, the more likely the legislature meant to impose liability without regard to fault.[51]

Guided (if we are) by these authorities, we turn to the ordinance in question. The Adult Businesses Ordinance is a land-use control to regulate the harmful, secondary effects of such businesses.[52] It makes it an offense to own, operate, or conduct any business in an adult bookstore, adult motion picture theater, or nude live entertainment club within one thousand feet of another such business or a church or a school or a residence or a park adjacent to a residential district.[53] The appellant was prosecuted for conducting business, rather than owning or operating a business.

The ordinance is silent as to a culpable mental state. There is, therefore, a presumption that one is required.

We are not provided with a legislative history of the ordinance.

Some features of the ordinance are consistent with its imposing strict liability. The punishment is only a fine. The ordinance applies only to persons in a certain trade, and to their carrying on a business. Prosecuting officials would have some difficulty in proving that an employee of such a business was aware of its location in relation to other properties. It is, in some sense, an ordinance to protect public safety or welfare.[54]

But it is hardly in the class of public-safety statutes that we have found to impose strict liability, such as those that punish such dangerous activities as speeding, adulteration of food, driving while intoxicated, and pollution of water.

Another important feature is that the particular offense before us was "conducting"—by dancing—the business sought to be regulated. A defendant such as the appellant would have some difficulty in determining whether the place in which

---

50. "The penalty is generally small, but that is also true for violation of countless ordinances, statutes, and regulations which are not subjected to strict liability." HALL, *supra* note 31, at 330.

51. 1 LaFave & Scott, *supra* note 27, at 342–44 (factor 2, statutory guidance, omitted because discussed separately above; subsequent factors renumbered) (footnotes omitted).

52. "The regulations in this zoning code of adult bookstores, adult motion picture the-aters and nude live entertainment clubs are intended to be land use controls meant to regulate the harmful secondary effects of such uses only ...." EL PASO CITY CODE § 20.08.080(F).

53. See *supra* note 1.

54. As Glanville Williams writes, "To use these expressions is easier than to say exactly what they mean. All crimes are, in a sense, public welfare offences." WILLIAMS, *supra* note 31, at 235.

she was conducting business was within the specified distance from one of the specified properties. Her incentive to ascertain such facts would seem very slight, compared to the incentive of the owner of the business who was responsible for choosing its location. We have difficulty in saying that an employee of such a business "is in a position to prevent [the violation] with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities." [55]

Nude dancing is not a new creation of the industrial revolution. The common law classified public nudity as an offense *malum in se.*[56] Presumably, so would be the offense of conducting a public-nudity business within a thousand feet of a school, church, residence, park, or another such business. And, although it is difficult to judge the extent to which the ordinance is supported by public mores, and the extent to which the offense it defines arouses public resentment that would be associated with traditional crimes, it is probably safe to say that the moral factor is significantly stronger than for the usual "public welfare" offenses.

And the number of prosecutions under this ordinance would not be expected to be great.

After consideration, we cannot say that the ordinance manifests an intent to dispense with a culpable mental state sufficient to overcome the presumption that one was required. We must conclude, therefore, that a culpable mental state was required by Penal Code Sections 1.03 and 6.02.

The judgment of the Court of Appeals is affirmed.

MEYERS, J., filed a dissenting opinion. MANSFIELD, J., filed a dissenting opinion. PRICE, J., filed a dissenting opinion. JOHNSON, J., filed a dissenting opinion, in which MEYERS and MANSFIELD, J.J., joined.

MEYERS, J., delivered this dissenting opinion.

I join Judge Johnson's opinion. The State Prosecuting Attorney (SPA) does not have standing to prosecute this discretionary review appeal concerning an El Paso city ordinance.

It doesn't matter that the parties have not addressed the issue. Standing should be assessed as a threshold matter:

> One of the most fundamental tenants of appellate law ... is the requirement that a party have standing to raise an issue before an appellate court. When challenging the constitutionality of a statute, it is incumbent upon the party raising the issue to show that it is unconstitutional as to him in his situation; that it may conceivably be applied unconstitutionally to others is not significant. *To establish standing, the party must show that he is injured, or that his rights are abrogated in the application of the alleged unconstitutional statute.*

> Thus, in *Meshell v. State,* 739 S.W.2d 246 (Tex.Cr.App.1987), before *any* discussion was had as to separation of powers, this Court properly determined the threshold issue of the Freestone County attorney's standing to complain....

---

55. *Morissette v. United States,* 342 U.S. 246, 254, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

56. "Public indecency, including nudity, was a criminal offense at common law, and this Court recognized the common-law roots of the offense of 'gross and open indecency' in *Winters v. New York,* 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Public nudity was considered an act *malum in se. Le Roy v. Sidley,* 1 Sid. 168, 82 Eng. Rep. 1036 (K.B.

1664). Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places." *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 568, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (opinion of Rehnquist, C.J.). "Public indecency—including public nudity—has long been an offense at common law." *Id.* at 572, 573 (opinion of Scalia, J.).

*Rose v. State,* 752 S.W.2d 529, 558 (Tex. Crim.App.1987) (McCormick, J., dissenting) (citations omitted).

Nearly all of the cases in criminal law jurisprudence involving standing are search and seizure cases in which the defendant's subjective privacy interests in the place searched or the items seized are in question. In that context, the question of standing is so intertwined with the personal nature of Fourth Amendment rights that it is considered an element of the defendant's Fourth Amendment claim, and therefore its absence may be raised by the State for the first time on appeal. *State v. Klima,* 934 S.W.2d 109, 111 (Tex.Crim. App.1996). We have further recognized:

> [t]he reviewing court may properly sustain the trial court's denial on the ground that the evidence failed to establish standing as a matter of law, even though the record does not reflect that the issue was ever considered by the parties or the trial court.

*Wilson v. State,* 692 S.W.2d 661, 671 (Tex. Crim.App.1984) (opinion on rehearing). However, the State is not allowed to raise a question of the defendant's standing (in the Fourth Amendment context) for the first time on discretionary review. The reason being that this Court does not address, on discretionary review, any issues not addressed and decided by the Court of Appeals:

> In the instant case, the State did not present the issue of standing to the Court of Appeals as an independent ground for upholding the trial court's ruling on the motion to suppress. Consequently, the Court of Appeals did not decide whether appellant had standing to complain of any search or seizure violation. Without a decision by the Court of Appeals on that issue, this Court has nothing to accept for review regarding appellant's standing. Therefore, we find that the State has waived

the right to challenge appellant's standing to complain. . . .

*Angel v. State,* 740 S.W.2d 727, 730 (Tex. Crim.App.1987).

The standing issue here is quite different from the typical Fourth Amendment standing cases where the issue of the defendant's standing should be raised before and addressed initially by the Court of Appeals. The SPA is the complaining party before this Court. The question of the SPA's standing was not addressed by the Court of Appeals because the SPA was not a party before that court. Thus, the standing issue did not arise *until* the SPA filed its petition with this Court. Since it could not have been addressed by the Court of Appeals, we are not constrained by our review jurisdiction. We may address the issue with the same authority we have to address our own jurisdiction.

With these comments, I join Judge Johnson's opinion.

MANSFIELD J., delivered the dissenting opinion.

I agree with the opinion of the Court, affirming the judgment of the court of appeals. Clearly, a culpable mental state is required in a municipal ordinance that purports to regulate adult businesses and treats violations of said ordinance as a criminal offense. See Tex. Penal Code, §§ 1.03 and 6.02. I am troubled, however, with the concept of creating criminal offenses through laws that are, at heart, regulations on the use of property, i.e., zoning ordinances. It is especially troublesome and potentially dangerousness where the motivation behind such laws is to criminalize activities deemed "politically incorrect," such as topless dancing.[1]

However, I also agree with the dissent that Texas Government Code §§ 42.001 and 42.005 do not allow the State Prosecuting Attorney to represent a municipali-

---

1. In my opinion, regulation of activities like adult entertainment businesses is best left to civil, not criminal, statutes.

ty before this Court, either on his own or on behalf of the municipality's attorney. Accordingly, I would dismiss the petition of the State Prosecuting Attorney on the ground that he lacks standing and join Judge Johnson's dissenting opinion.

PRICE, J., delivered a dissenting opinion.

I respectfully dissent. This case should be dismissed as improvidently granted because it raises a related issue that complicates this case and in my view prevents us from reaching the merits of the grounds for review we originally granted.

We granted the state's petition for discretionary review on the following grounds:

1. What is the proper analysis for determining whether an ordinance plainly dispenses with any mental element within the meaning of Texas Penal Code § 6.02(b) where the plain language of the ordinance does not require a culpable mental state.

2. Is an ordinance that does not require a culpable mental state and that prohibits, as a land use control, the operation of a nude live entertainment club within 1,000 feet of certain establishments, (e.g.churches, schools), a malum prohibitum provision imposing strict liability?

Unfortunately, ground one as formulated, presumes that § 6.02(b) applies to municipal ordinances. The briefs of the parties also make the same presumption. Consequently, we do not have the benefit of scholarly discussion by either party regarding this issue. The majority avers that § 6.02 applies to municipal ordinances based on our holding in *Honeycutt v. State*, 627 S.W.2d 417 (Tx.Crim.App.1982) and the phrase "other laws" found in section 1.03(b) of the Penal Code. *Ante, at* 470. I am not convinced that this question is so easily settled. First, the majority's interpretation of the phrase "other laws" is not supported by a reading of § 1.03(b) in its entirety. The phrase, " other laws" is immediately followed by the phrase, "unless the *statute defining the offense* provides otherwise." Arguably, then, the phrase "other laws" refers not to municipal ordinances, but rather statutes defining offenses that are found outside of the penal code. *See e.g.* TEX. PARKS & WILDLIFE CODE ANN. §§ 47.0183(b), 66.019(c), 66.021(c); TEX. TAX CODE ANN. § 153.404(a), TEX. WATER CODE ANN. § 7.147(b).

Second, a thorough reading of *Honeycutt* reveals that it has little if any relevance to the issues present in this case. The city ordinance at issue in *Honeycutt* defined the offense in terms of a culpable mental state of negligence, a culpability distinct from each of the four established in § 6.02 of the Penal Code. The complaint alleged the offense in the same terms, omitting any culpable mental state required by § 6.02. We reasoned that because the ordinance did not include one of the four culpable mental states in the definition of negligent collision and because the definition of negligent collision also did not plainly dispense with any culpable mental state, it was in fact attempting to apply a new culpable mental state not created by the penal code. We held that the term "statute" as used in section 1.03(b) of the penal code refers to enactments of the legislature, and was intended to reserve to the legislature the power to define offenses in abrogation of the provisions of Titles 1, 2 and 3 of the Code, which include the culpable mental state requirements of § 6.02. We reached this conclusion by noting that to hold otherwise would mean that a municipal ordinance could create an offense establishing criminal liability irrespective of the existence of any such legislatively codified general rules of culpability, defenses and justifications. *Id.*

While the present case also involves a municipal ordinance, this is where the similarities end. Rather than creating a culpable mental state outside the penal code,

here the El Paso city ordinance is silent as to a culpable mental state. Consequently, the only guidance we can glean from *Honeycutt*, is that at the very least, a municipal ordinance must contain one of the culpable mental states authorized by § 6.02(a). This case however, raises the question of whether the drafters of § 6.02 could have intended that municipalities enact strict liability offenses. The majority's analysis of this question is inadequate. While it is true that the *Honeycutt* Court did rely at least partially on the fact that the negligent collision ordinance did not plainly dispense with a culpable mental state in order to hold the ordinance void, this aspect of that decision appears to have been given only cursory attention (one sentence). Therefore, before we rely on *Honeycutt* as precedential authority allowing municipalities to draft strict liability offenses, a more thorough look at the issue would be wise.

Because the grounds for review and the briefs of the parties filed in this case do not adequately encompass the actual issue raised, I would dismiss the petition as improvidently granted. *See* Tex.R.App. P. 69.3.

JOHNSON, J., filed a dissenting opinion, in which MEYERS and MANSFIELD, J.J., joined.

I respectfully dissent. Appellant was convicted, in the El Paso municipal court, of violating El Paso, Tex., City Code § 20.08.080. She appealed to the El Paso Municipal Court of Appeals, which affirmed the conviction. She then appealed to the 8th Court of Appeals in El Paso, which reversed the conviction. Aguirre v. State, 978 S.W.2d 605 (Tex.App.—El Paso 1998, pet. granted).

The record shows that at all times during the prosecution of the case and of the appeal, through the proceedings in the El Paso Court of Appeals, the case was handled exclusively by the office of the El Paso city prosecutor, represented by Herb Fleming. However, the petition for discretionary review was filed with this Court solely by the State Prosecuting Attorney; the office of the El Paso city prosecutor played no part in the appeal to this Court.

The office of the State Prosecuting Attorney is created by statute [1] and therefore has only the specific authority and standing granted to it by the Legislature. The limits of that statutory grant are set out in Tex. Gov't Code chapter 42, which provides:

§ 42.001. Office; Qualifications

(a) The court of criminal appeals shall appoint a state prosecuting attorney *to represent the state* in all proceedings before the court. The state prosecuting attorney may also *represent the state* in any stage of a criminal case before a state court of appeals if he considers it necessary for the *interest of the state.*

. . .

§ 42.002. Oath; Term

. . .

§ 42.003. Assistant State Prosecuting Attorneys

. . .

§ 42.004. Removal

. . .

§ 42.005. Cooperation with Other Prosecuting Attorneys

(a) The state prosecuting attorney may assist a *district* or a *county* attorney *in representing the state* before a court of appeals if requested to do so by the *district* or *county* attorney.

(b) A *district* or *county* attorney may assist the state prosecuting attorney *in representing the state* before the court of criminal appeals.

§ 42.006. Sunset Provision

---

1. *See* Tex. Gov't Code Ann. chap. 42 (Vernon 1988 & Supp.1999).

. . . .

(Emphases added.)

Thus, § 42.005 specifically provides for a relationship of representation between the State Prosecuting Attorney and district and county attorneys, but excludes city attorneys. Under our approach to statutory interpretation, we look to the literal text of the statute for its meaning, and we ordinarily give effect to that plain meaning, unless application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended, or if the plain language is ambiguous. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App.1991). Pursuant to this approach to statutory interpretation and to the legal maxim, "Expressio unius est exclusio alterius" (the expression of one thing is the exclusion of another), § 42.005 must be interpreted to mean that the legislature did not intend for the State Prosecuting Attorney to represent a city attorney in the Court of Criminal Appeals. This interpretation of § 42.005 is consistent with § 42.001, which provides in relevant part that "[t]he court of criminal appeals shall appoint a state prosecuting attorney to represent the *state* in all proceedings before the court." (Emphasis added.) The plain language of § 42.005 is unambiguous. Applying the plain language to exclude city prosecutors does not to lead to "absurd" results; the kinds of offenses prosecuted only at the municipal level do not affect areas outside of that municipality and so do not impact "the interest of the state" as stated in § 42.001.

The instant case involves an El Paso city zoning ordinance.[2] The contention that the State Prosecuting Attorney lacks standing is further supported by a provision of the El Paso Courts Act which requires that "all appeals from convictions in the municipal court of record *must be prosecuted in* the appellate court, the court of appeals, and *the court of criminal appeals by the city attorney or an assistant city attorney.*" Tex. Gov't Code § 30.00145 (emphasis added). The Act therefore bars the State Prosecuting Attorney from prosecuting this case before this Court, as it specifically requires that the city attorney, not the State Prosecuting Attorney, prosecute all appeals in this court. The State Prosecuting Attorney's authority to represent the state before this court, and any limitations on that authority, are determined solely by the legislature. Therefore, it cannot be said that other statutes passed by the legislature which limit that authority "usurp" it. What the legislature gives, it may take away or limit.

The majority attempts to rationalize its assertion that the State Prosecuting Attorney has standing to bring this appeal by engaging in a lengthy historical discourse. *Ante,* at 466 – 471. Such an historical "appreciation," however, conflicts with our approach to statutory interpretation. As noted above, the literal text of the statutes is not ambiguous and does not lead to an absurd result that the legislature could not have intended; legislative history is therefore irrelevant. *See Boykin,* 818 S.W.2d at 785. Furthermore, the legislative history cited by the majority, which dates back to the late 1800s, is less relevant and the literal text of the contemporary statutes is more relevant, given the following: (1) the office of the State Prosecuting Attorney, as we know it, did not exist until 1923;[3] (2) the texts of the various statutes concerning the State Prosecuting Attorney

---

2. This offense is neither found in the Penal Code nor created by the legislature, and does not regulate the same subject matter as a state law.

3. *See* Act of March 30, 1923, 38 th Leg., R.S., ch. 156, §§ 1 & 2, 1923 Tex. Gen. Laws 335, 335 (providing for appointment of "an attorney for the State before the Court of Criminal Appeals of Texas" and "an assistant to the attorney for the State before the Court of Criminal Appeals of Texas"). These sections replaced laws which provided for the appointment and payment of an Assistant Attorney General. *See* Tex.Rev.Civ. Stats., tit. 65, ch. 5, art. 4432 & tit. 120, ch. 3, art. 7060 (1911).

have changed considerably over the years, the last major change in substance occurring in 1981;[4] and (3) the current version of the El Paso Courts Act came into existence in 1983,[5] two years after the current form of the State Prosecuting Attorney's authority was delineated.[6]

Therefore I conclude that, pursuant to the legislature's limited statutory grant of authority and the further limitations of the El Paso Courts Act, the State Prosecuting Attorney is not authorized to represent the City of El Paso before this Court in the instant case. This petition should be dismissed because the State Prosecuting Attorney lacks standing to bring this appeal, and because the City Attorney, the only authorized representative of the City of El Paso, chose not to appeal to this Court. *See* Tex.R.App. P. 69.3.

Because I believe that we should not reach the merits of this appeal but should dismiss the petition for lack of standing, I dissent.

---

4. *See* Tex. Gov't Code §§ 42.001–42.006; Act of May 31, 1981, 67th Leg., R.S., ch. 291, § 30, 1981 Tex. Gen. Laws 761, 776; Act of May 12, 1977, 65th Leg., R.S., ch. 256, § 1, 1977 Tex. Gen. Laws 675, 675; Act of May 25, 1973, 63rd Leg., R.S., ch. 498, § 1, 1973 Tex. Gen. Laws 1328, 1328–1329; Act of May 18, 1931, 42nd Leg., R.S., ch. 139, § 1, 1931 Tex. Gen. Laws 234, 234–235; Act of March 30, 1923, 38th Leg., R.S., ch. 156, 1923 Tex. Gen. Laws 335, 335.

5. The initial version was passed in 1979, then repealed by and replaced with the current statute in 1983. *See* Act of May 27, 1979, 66th Leg., R.S., ch. 410, §§ 1–32, 1979 Tex. Gen. Laws 893, 893–900 ("City of El Paso Municipal Courts"), *repealed by* Act of May 20, 1983, 68th Leg., R.S., ch. 685, §§ 1–4,

1983 Tex. Gen. Laws 4290, 4290–4316 ("El Paso Courts Act").

6. *See* Act of May 20, 1983, 68th Leg., R.S., ch. 685, §§ 1–4, 1983 Tex. Gen. Laws 4290, 4290–4316; Act of May 31, 1981, 67th Leg., R.S., ch. 291, § 30, 1981 Tex. Gen. Laws 761, 776.

Although the legislature has subsequently made changes to the provisions granting authority to the State Prosecuting Attorney, the changes are of form, rather than substance. *See* Tex. Gov't Code §§ 42.001–42.006 (Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1720, 1921–1922); Act of May 31, 1981, 67th Leg., R.S., ch. 291, § 30, 1981 Tex. Gen. Laws 761, 776.